Wallace **WOODINGTON**, Plaintiff-Appellee,

v.

The **PENNSYLVANIA RAILROAD COMPANY** and S. J. Groves & Sons Co., Inc., a Minnesota corporation, Eagle, Pennsylvania, Defendants-Appellants.

No. 334, Docket 24000.

United States Court of Appeals Second Circuit.

Argued April 12, 1956.

Decided Aug. 22, 1956.

---

Philip Price, Philadelphia, Pa. (Robert M. Landis, Philadelphia, Pa., and David J. Mountan, Jr., of Conboy, Hewitt, O'Brien & Boardman, New York City, on the brief), for defendant-appellant Pennsylvania R. Co.

John F. X. Finn, New York City (Cohen & McGuirk and Constantine P. Lambos, New York City, on the brief), for defendant-appellant S. J. Groves & Sons Co., Inc.

B. Nathaniel Richter, of Richter, Lord & Levy, Philadelphia, Pa. (Leo Gitlin, New York City, on the brief), for plaintiff-appellee.

Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.

CLARK, Chief Judge.

This is an appeal by both defendants from a judgment against both in the amount of $297,500 entered after trial before Judge Bicks and a jury. Plaintiff Woodington, a Pennsylvania Railroad engineman, sustained serious injuries when the freight train on which he was then acting as fireman collided with a six-wheel, motor-powered crane weighing more than 24½ tons, which stalled on the railroad tracks at the Longs Road grade crossing near King of Prussia, Pennsylvania. Plaintiff brought this action against the Pennsylvania Railroad under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., and against Groves at common law for negligence, invoking the diversity-of-citizenship jurisdiction of the court.

On the day of the accident Woodington's 67-car freight train was traveling east through a sparsely settled area on a double-track line which curves toward and then crosses Longs Road, a little-used spur road connecting two highways. The crossing was guarded by standard reflector-type, cross-buck warning signs, which had been installed under an order of the Pennsylvania Public Utility Commission after a public hearing upon the railroad's application to close off the crossing entirely. From a safe position clear of the crossing there is a view of the tracks toward the west, the direction from which the train approached, and a reciprocal view from the train to the crossing variously estimated by witnesses as from 700 feet to one-half mile.

The crane, which was equipped with a 20-foot boom extending ahead of its cab, approached the railroad tracks and stopped about 40 feet away from the first rail. After waiting for another freight train and engine to clear the crossing, the crane operator, directed by his assistant standing outside the crane on the crossing, began to move the heavy vehicle slowly over the crossing. While in the process of moving over the tracks, the crane stalled; and efforts by the operator to start it again were futile.

Woodington's train, then being operated by the fireman, McDonald, was approaching at a speed variously estimated at from 30 to 50 miles per hour. Fifty miles per hour was the speed authorized by the railroad company in that section. McDonald, although acting as a fireman on this run, had had long experience as an engineer. There was testimony that he blew the customary warning whistle at the eastbound whistle board approximately 1470 feet from the crossing. Woodington testified that he could first see the crane after the train rounded the curve at a distance of about 800 feet from the crossing. He thought the crane was then still moving forward. The crane operator, however, estimated that it was stalled on the tracks from a minute and a half to two minutes. McDonald promptly applied the brakes, which functioned properly; but the train was unable to stop before crashing into the heavy crane. The crane operator jumped to safety shortly before the collision, but Woodington received serious, and McDonald fatal, injuries.

For several months before the accident defendant Groves had been engaged in construction work on the Pennsylvania

Turnpike and had used the crane in connection with this work. Because of its large bulk the crane was prohibited by the Pennsylvania Vehicle Code from being moved on the highways without a special permit issued for a single trip by the Secretary of Highways, subject to certain regulations and conditions prescribed in the permit.[1] The regulations required the permittee to follow the route prescribed by the highway officials, and stated that nothing in the permit should be construed to authorize crossing railroad tracks at grade without first notifying and making proper arrangements with the railroad company. At the time of the accident the crane was being operated without the required permit. Though it was crossing at grade, this was not necessary; the underpass for State Highway Route 23 is about 300 yards west of the Longs Road crossing, and beyond this underpass is a vehicular bridge over the Pennsylvania tracks at Croton Road.

There was testimony that the Pennsylvania Railroad had an established procedure under which, if it were notified of intended movements of heavy equipment over grade crossings, it would hold the equipment at the crossing until there was a suitable interval between trains, then set block signals against trains in both directions, and permit the equipment to cross under the supervision of a railroad employee. Groves gave no notice to the railroad of the intended crossing which resulted in this accident, and the special procedure was not invoked.

Groves' Vice-President McKay, who was in charge of the project to which the crane was assigned, testified that on his project he would sometimes take a chance and move a vehicle without getting a permit; if he were caught he would pay the fine and if not he would escape paying the permit fee. Groves' Vice-President Klock, who was in charge of another Groves' highway project in the area, testified that he never permitted his overweight vehicles to move without a permit and, before crossing railroad tracks at grade, communicated with the railroad company, which then set a time when it was safe to cross.

Several days before the accident the crane had been moved from McKay's project at Eagle, Pennsylvania, to Klock's project at Conshohocken. For that movement a permit was obtained from the Pennsylvania Department of Highways which required the crane to go by way of the Route 23 underpass, so that it would not go over the Pennsylvania tracks at grade. On that trip the crane passed safely through the underpass after the crane operator and his assistant turned the boom around. On the return trip from Conshohocken to Eagle no permit was obtained; and, in order to save the trouble and possible damage to the vehicle involved in reversing the boom, the operators used the Longs Road grade crossing instead of the underpass prescribed by the Department of Highways. There was further evidence that the crane had had engine trouble prior to the accident and had stalled on several prior occasions; a minor repair was made on the morning of the accident.

1. Pennsylvania Vehicle Code, Act of May 1, 1929, P.L. 905 as amended, §§ 901, 905, 75 Pa.Stat.Ann. §§ 451, 455. Section 901 contains a prohibition against the operation on public highways of all oversized, overweight vehicles. Section 905 provides in part:

"(a) The Secretary of Highways of this Commonwealth, and local authorities in their respective jurisdictions, may, in their discretion, upon application in writing accompanied by the fee provided in this act, and good cause being shown therefor, issue a special permit, in writing, authorizing the applicant to operate or move * * * a vehicle * * * of a size or weight exceeding the maximum specified in this act upon any highway under the jurisdiction of and for the maintenance of which the authorities granting the permit are responsible. * * * Every such permit shall be issued for a single trip, and shall designate the route to be traversed, subject to such rules, regulations, restrictions, or conditions, as shall be deemed necessary by the authority granting such permit. * * *"

Fireman McDonald's widow and executrix brought an action for his wrongful death resulting from this same accident in the federal district court in Pennsylvania. The jury there returned a verdict against Groves, but in favor of the Pennsylvania Railroad. McDonald's appeal from the verdict in favor of the Pennsylvania was dismissed as defectively raised, but the Third Circuit affirmed the judgment against Groves. McDonald v. Pennsylvania R. Co., 3 Cir., 210 F.2d 524.

### Appeal of S. J. Groves & Sons Co., Inc.

■ In the matter of Groves' appeal we reach the same result as the Third Circuit, McDonald v. Pennsylvania R. Co., supra, 3 Cir., 210 F.2d 524, 530, and accept the analysis made by that court of the arguments presented by Groves, the more significant of which are similar to those offered here. The court there said: "In the case at bar a man was killed by reason of a senseless accident caused by the indifference of the employees of a large contracting company, reflected by at least one of its officers, to the laws of Pennsylvania governing highway traffic." Indeed, there was more than sufficient evidence to justify submission of the case to the jury. Thus the jury could predicate Groves' negligence on one or more of four factors: (1) failure to secure the permit required by the Pennsylvania Code, see Jackson v. Blue, 4 Cir., 152 F.2d 67; 2 Restatement, Torts § 286 (1934); (2) failure to notify the railroad authorities of its intention to take this crane over the grade crossing; (3) choosing the grade crossing, rather than the underpass, as a route to move its crane, see Starovetsky v. Pennsylvania R. Co., 328 Pa. 583, 195 A. 871; Tharp v. Pennsylvania R. Co., 332 Pa. 233, 2 A.2d 695; Simpkins v. Pennsylvania R. Co., 334 Pa. 1, 5 A.2d 103; Scurco v. Kart, 377 Pa. 435, 439, 105 A.2d 170; and (4) stalling the crane at the crossing.

■■ The Pennsylvania statute was intended both to prevent damage to highways and to promote traffic safety. Had Groves obeyed the statute, selected the safer route, or followed the railroad's special crossing procedure, the jury could reasonably infer that no accident would have occurred. It could also infer that the stalling resulted from either negligent maintenance or negligent operation of the vehicle. Further, we think Groves' attempt to show Woodington guilty of contributory negligence as a matter of law based on calculations of train speed must fail; this was clearly a jury question.

■ There is no substance to Groves' various assignments of error in the admission of evidence. It is claimed that plaintiff was erroneously permitted to introduce evidence of a prior contradictory statement of the crane operator, who was plaintiff's witness, concerning the passing of a westbound freight prior to the arrival of Woodington's train. But it is by no means clear that objection was raised to this testimony at the trial on the ground that plaintiff was attempting to impeach his own witness, the ground raised on appeal. In any event the alleged error involved a peripheral matter and was quite harmless.

■ We further find no error in the charge as to Groves. Nor on the evidence of serious and extensive injuries to plaintiff do we think there was any abuse of discretion in failing to set aside the verdict as excessive. See Comiskey v. Pennsylvania R. Co., 2 Cir., 228 F.2d 687; Stevenson v. Hearst Consol. Publications, 2 Cir., 214 F.2d 902, 910–911, certiorari denied Hearst Consol. Publications v. Stevenson, 348 U.S. 874, 75 S.Ct. 110, 99 L.Ed. 688.

### Appeal of the Pennsylvania Railroad

■ The appeal of the Pennsylvania Railroad presents more difficulty. The case against this defendant was given to the jury on the theory that it could find that the Pennsylvania had failed to provide plaintiff with a reasonably safe place to work upon a determination that the warning devices at the Longs Road crossing were inadequate when considered in connection with the speed of the

train and the distance from the crossing to the point where the train became visible after rounding the curve. The determination of that question in this action brought under the Federal Employers' Liability Act is governed by federal, rather than Pennsylvania, law. Dice v. Akron, C. & Y. R. Co., 342 U.S. 359, 361, 72 S.Ct. 312, 96 L.Ed. 398.

■ There was some evidence before the jury that the train was moving at a speed of 50 m.p.h. and that its crew were unable to see the crane at the crossing until they were within 700 to 800 feet. It was then too late to stop the train in time to avoid the collision. There was also some evidence that the crane was still moving when the train rounded the curve. On the basis of this evidence it would have been possible to find that more adequate warning devices (such as bells or blinker lights) at the crossing might have forestalled the accident by inducing the crane operator to refrain from moving his machine into the path of a train approaching rapidly from behind a curve. See Swafford v. Atlantic Coast Line R. Co., 350 U.S. 807, 76 S.Ct. 80, reversing *per curiam* without opinion, 5 Cir., 220 F.2d 901; Bailey v. Baltimore & O. R. Co., 2 Cir., 227 F.2d 344 (decided under the law of New York); Cahill v. New York, New Haven & Hartford R. Co., 350 U.S. 898, 76 S.Ct. 180, reversing *per curiam* without opinion, 2 Cir., 224 F.2d 637; O'Neill v. Baltimore & O. R. Co., 348 U.S. 956, 75 S.Ct. 447, 99 L.Ed. 747; Stone v. New York, C. & St. L. R. Co., 344 U.S. 407, 73 S.Ct. 358, 97 L.Ed. 441; Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Note, 69 Harv. L.Rev. 1441. While the evidence of negligence was thus not extensive, we regard it as adequate to present a jury question under modern Supreme Court decisions.

■ But the charge under which the case was presented to the jury was erroneous in one aspect and, we fear, substantially prejudicial. The court was charging in some detail as to the obligation of the railroad to provide plaintiff with a reasonably safe place in which to work and reasonably safe working conditions and went on to say: "In determining this issue, you may consider whether it was reasonably safe, under all the circumstances, for the defendant Pennsylvania to specify a 50 miles per hour speed limit if the train could not stop at Longs Road crossing, if necessary, within the visibility of its operator." [2]

2. The part of the charge from which this paragraph is excerpted reads as follows:

"The act also requires the railroad employer to provide its employees with a reasonably safe place in which to work and reasonably safe working conditions.

"This duty of providing a safe place to work is a continuing one. It applies to each and every place where the plaintiff may be required to work in the performance of his duties as an employee of this defendant. It continues even though the employee may be at any given point, in this case, for instance, at Longs Road grade crossing, for but a fleeting moment of time.

"In determining whether the Pennsylvania Railroad has complied with this duty of providing a reasonably safe place to work at Longs Road grade crossing, you may consider such things, among others, as the following: The nature of the work he was performing; the rules, regulations and orders under which the plaintiff was required to perform his work; the hazards involved; the speed at which the locomotive was to operate; the fact that Longs Road is a public highway; the character of the traffic that may be expected there; the opportunity for visibility afforded the engineer of the locomotive as he approaches that road; the condition of the roadbed at that grade crossing; and the visibility available to a motorist undertaking to cross the tracks at this crossing. In addition, you are to consider, in conjunction with the speed at which the train is directed to be operated by the railroad, the precautions taken by it at Longs Road grade crossing to give advance warning of the approach of a train.

"You may also consider the period of time that elapses from the moment the train first becomes visible to the motorist until the train reaches the grade crossing itself.

"As I have already told you, the law leaves the determination of the speed at which a train may be run to the railroad company. However, the law imposes a further duty upon the railroad company

The clear import of this statement is that the railroad had a duty to operate its trains at such speeds that they could be stopped within the range of their operators' vision. Nor does the phrase "under all the circumstances" render this aspect of the railroad's conduct merely one more factor in determining the adequacy of warning signals. Upon the crane operator's testimony, the crane was stalled on the tracks for 1½ to 2 minutes before the collision. No known type of warning device could have prevented the crane from attempting to cross the tracks such a long time before the arrival of the train. And once the vehicle had stalled on the tracks, the activation of a warning device could have had no effect in avoiding the collision. Hence only if the jury believed Woodington's testimony that the crane was still moving toward the tracks shortly before the accident could it reasonably conclude that the nature of the warning devices had anything to do with the collision. And only on this state of the facts would train speed and range of the train operator's vision be proper matters for the consideration of the jury. See Plough v. Baltimore & O. R. Co., 2 Cir., 172 F.2d 396, certiorari denied 337 U.S. 940, 69 S.Ct. 1518, 93 L.Ed. 1745. But the state of the evidence made rather likely a conclusion that the crane was stalled for an appreciable period before the crash, and hence a considerable possibility, if not probability, that the jury would take the

quoted charge quite seriously to find some duty on the part of the engineman to be able to stop the train at any point along the track within the range of its operator's vision in order to avoid the dangers of stalled objects lodged on the right of way. Thus the error in failing to exclude such an interpretation, and indeed of substantially suggesting it, was serious.

Moreover, the speed of the train and the ability to stop within the engineer's range of vision were factors which were completely irrelevant if the jury found— as it well might have done—that, in view of Pennsylvania law with respect to overweight vehicles and the railroad's practice with respect to their crossing at grade, the locomotive cab was a reasonably safe place in which to work even during the fleeting moments when it was passing the Longs Road crossing. Thus, in effect, the portion of the charge excepted to practically invited the jury to predicate negligence on factors which on its other findings may have been irrelevant. So it was nowhere limited and declared to be inapplicable to a state of facts here highly probable, where the adequacy of the warning signals would have no connection with the accident.

The proposition that a railroad train must be operated at so slow a speed as to permit it to stop within the range of its operator's vision is not supported by authority. See Guyler v. Lehigh Valley R. Co., 165 Pa.Super. 196, 67 A.2d 575;

---

to exercise such care at grade crossings so as to prevent accidents at these points by installing devices which will provide such advance warning of the approach of a train as the circumstances reasonably require.

"Having given due consideration to all of these various factors and having given such weight to each or any of them as you believe they are entitled, it will be for you to say whether the defendant Pennsylvania has complied with its duty toward the plaintiff of exercising reasonable care and providing him a reasonably safe place to work.

[Here followed the statement quoted in the text. The charge then continued:]

"You may take into consideration the fact that the railroad complied with the requirements of the Public Utility Commission of Pennsylvania as to the warning installations at Longs Road crossing. In this connection, I instruct you, however, that the decree of the Pennsylvania Public Utility Commission that directed certain advance warning signs of the presence of tracks alone be installed is not binding or conclusive on the plaintiff on the issue whether the railroad supplied the plaintiff with a reasonably safe place to work.

"The ultimate decision of whether, in the light of all the circumstances in this case, the railroad company provided the plaintiff with a safe place to work is for you and you alone in the light of all the evidence."

Custer v. Baltimore & O. R. Co., 19 Pa. Super. 365, affirmed 206 Pa. 529, 55 A. 1130; Veres v. Pennsylvania R. Co., 161 Pa.Super. 177, 54 A.2d 77; Homeland Ins. Co. v. Thompson, La.App., 12 So.2d 62; Seaboard Air Line R. Co. v. Crowder, 191 Va. 635, 62 S.E.2d 227. Such a rule would be obviously detrimental to speedy and efficient railroad operation and would mean that the railroads of the country are daily guilty of negligent operation of their most important trains. We must of course consider the charge as a whole to determine its over-all effects as to whether they indicated prejudice requiring a new trial. And it is true that the charge in certain paragraphs refers to speed, visibility, warning devices, and other pertinent matters as important factors in determining the degree of care exercised by the railroad here. But nowhere does it distinguish the governing principles of law according to their applicability to the quite distinct situations of a long-stalled vehicle and a vehicle just approaching the crossing. Indeed the very emphasis on such factors as visibility both to the trainmen and to motorists adds to the implication that speed must be limited by visibility. So, too, the detail of the charge as to the duty to furnish a safe place in which to work, continuing even though the employee was at the crossing "for but a fleeting moment of time," serves to highlight the error. And its importance in modern railroading is additional reason why it can hardly be overlooked.

It is now suggested that the judge meant the restriction on train speed to apply only when (as the jury must have found) the crossing warnings were inadequate. But this is a *post-hoc* rationalization not within the judge's thought,[3] and dependent for its validity on those very premises which we have questioned above as not explained to the jury. For, as we have pointed out, the jury in order to reach a legal verdict had to find not only that the warnings were inadequate,[4] but further, and against the more persuasive evidence, that the crane had not stalled upon the tracks, but was still moving so that the better warnings would have enabled the operator to stop in time to avoid the accident. The more natural view, both from what the jurors were told and from what they were not told, is, however, that they understood that the engineman must be able to stop his train in time to avoid an obstacle he saw before him on the track. And what this would mean to modern railroading is shown by the expert testimony that this train, going at 50 miles per hour, would actually require about 4500 feet for an emergency stop.

Exception was clearly taken and pressed to the charge as given.[5] While reversal of a judgment on a jury verdict is always a serious matter, yet it seems appropriate to point out that here justice may well be subserved thereby. It is quite clear that the negligence of Groves was gross, while that of the Pennsylvania was slight and based upon rather limited and debatable evidence. This the jury undoubtedly sensed; near the beginning of its deliberations it sought to find whether it could establish degrees of negligence between the defendants and, being told that it could

---

3. In addition to the wording of the charge itself, note may be taken of the colloquy of the judge with counsel for defendant in refusing a request to charge and in stating that the question of the 50-mile rate of speed must be considered under the circumstances of "limited vision" present and giving as example a "gate" crossing where a speed of 70 or 80 miles an hour might not be negligent. Thus while he was plainly correlating speed with physical conditions as they might exist, the judge was not defining the railroad's duty as increased by its default.

4. Despite the railroad's full compliance with the order of the Pennsylvania Public Utility Commission entered on refusal of the railroad's application for the closing of the grade crossing.

5. Defendant specifically objected to leaving to the jury as negligence the question of being able to stop within the range of vision and was going on to explain "that the mere fact that the train could not be stopped within the range of vision—" when the judge stopped counsel and gave him a general exception. See also note 3 supra.

not, nevertheless continued in rather lengthy deliberations. Under the circumstances, it seems particularly desirable that a finding against this defendant should be without taint of legal error.

We are therefore constrained to conclude that the Pennsylvania Railroad must have a new trial because of the prejudicial charge. In view of this conclusion we need not reach the question of the alleged prejudicial remarks made by Groves' counsel in summation. Although these efforts to create prejudice against the railroad were improper, we agree with the forceful, if inelegant, conclusion of the judge that the jury "would not be influenced by such tripe."

Affirmed as to defendant Groves, reversed and remanded for a new trial as to the question of liability only as to defendant The Pennsylvania Railroad Company.

LUMBARD, Circuit Judge (concurring as to Groves and dissenting as to Pennsylvania Railroad Co.).

I concur in the opinion of the majority insofar as it relates to the appeal by Groves. I am constrained to dissent, however, from that portion of the opinion which reverses the judgment against the Pennsylvania Railroad.

My brothers concede that there is sufficient evidence in the record to justify a jury finding that more adequate warning devices at the crossing might have fore-stalled the accident. They find error, however, in that portion of the charge where Judge Bicks instructed the jury as follows:

"In determining this issue, you may consider whether it was reasonably safe, *under all the circumstances*, for the defendant Pennsylvania to specify a 50 miles per hour speed limit if the train could not stop at Longs Road crossing, if necessary, within the visibility of its operator." (Emphasis supplied.)

My disagreement with the majority is highlighted by Judge CLARK'S statement that "The clear import of this statement is that the railroad had a duty to operate its trains at such speeds that they could be stopped within the range of their operators' vision." To me Judge Bicks' language taken in its context does not have that meaning. It means only that the railroad may *under some circumstances* have a duty to operate its trains at such speeds that they can be stopped within the range of their operators' vision. It seems to me that this proposition is unexceptionable. If the railroad fails to provide devices at the crossing which will give adequate warning of approaching trains, then it may well have a duty to slow its trains to the point where they can be stopped before reaching the crossing. It seems to me that this is all that Judge Bicks was saying and that it is all that the jury could have understood him to mean.[1]

---

1. The majority opinion suggests that this is a "post-hoc rationalization not within the judge's thought * * *." It seems to me, however, that the colloquy to which Judge CLARK refers in his footnote 3 indicates quite clearly that this is precisely what Judge Bicks had in mind and what he intended to convey to the jury. Thus as a part of that colloquy Judge Bicks said:

"Where you have this kind of warning signal, then you consider that in connection with the rate of speed at which you pass that place, and you consider the rate of speed in connection with the warning signal. If you had a gate crossing and if you were going 70 or 80 miles an hour, I might be inclined to say that you were not negligent. You must fix a rate of speed under which those conditions are reasonable and prudent, and the jury has a right to consider that as to whether the rate of speed under those circumstances with that limited visibility and that kind of a crossing, was reasonable."

I think this discussion demonstrates that Judge Bicks intended to hold the railroad to a duty of making the crossing reasonably safe either by providing signals adequate for high-speed trains or by slowing the trains. The example which he gave clearly indicates that if adequate signals were maintained there would be no duty to operate the trains at speeds such that they could be stopped within the visibility of the operator.

Just a few paragraphs before the language to which the majority objects, Judge Bicks had given the jury a comprehensive list of the factors to be considered in determining whether Pennsylvania was negligent, including the hazards involved, the speed at which the locomotive was to operate, the character of the traffic to be expected at the crossing, the engineer's visibility approaching the crossing, and a motorist's visibility approaching the track. That paragraph concluded with the following language:

"In addition you are to consider *in conjunction with the speed at which the train is directed to be operated by the railroad,* the precautions taken by it at Longs Road grade crossing to give advance warning of the approach of a train." (Emphasis supplied.)

He then said:

"As I have already told you, the law leaves the determination of the speed at which a train may be run to the railroad company. However, the law imposes a further duty upon the railroad company to exercise such care at grade crossings as to prevent accidents at these points by installing devices which will provide for such advance warning of the approach of a train as the circumstances reasonably require.

"Having given due consideration to all these various factors and having given such weight to each or any of them as you believe they are entitled, it will be for you to say whether the defendant Pennsylvania has complied with its duty toward the plaintiff of exercising reasonable care and providing him with a reasonably safe place to work."

When Judge Bicks then continued with the language now complained of, I think it must have been clear to the jury that his meaning was that Pennsylvania had a duty to make the crossing reasonably safe either by providing adequate warning devices or by operating its trains slowly enough to stop before reaching the crossing. He did not instruct them that they might find that the railroad must operate its trains slowly enough to stop within the visibility of the engineer in all situations, including those where adequate warning devices are provided.

Pennsylvania's counsel, in taking exception to Judge Bicks' charge, made no argument that undue emphasis had been placed on the element of the train speed or that it had been improperly singled out as a separate ground of negligence. He argued rather that the train speed was not an element of negligence at all and his requested instruction was to that effect. But it seems to me quite clear that the adequacy of the signals could not properly be considered apart from the speed of the trains and that Judge Bicks was therefore justified in refusing Pennsylvania's request and in instructing the jury that both of these factors should be considered in determining whether the railroad was negligent.

Since Judge Bicks properly enunciated the principles upon which the jury's decision was to rest, I think there is no reason to speculate that they might have accepted one version of the facts rather than another and applied the principle in a situation where it was not properly applicable. Nor do I think that the trial judge was bound to give an additional instruction that if the crane had been stalled for some time the inadequacy of the signals could not be a proximate cause of the accident. This is what the majority seems to require. But counsel for Pennsylvania neither requested nor suggested such an instruction, nor was any exception taken to the instruction on causation which Judge Bicks gave. Thus under Rule 51, Federal Rules of Civil Procedure, 28 U.S.C., we should not now consider objections to that portion of the charge. For us to permit a fine-tooth combing of the charge to find error which was not clearly indicated at the required time seems to me to do violence to the spirit of the rule and the reasons which led to its adoption.

The issues in this case were relatively simple and in view of the careful and comprehensive charge which Judge Bicks gave I think it is unrealistic to suggest that the jury did not understand them. That the jury would have reached a different result had the charge of the judge been more detailed and specific on the point which troubles my brothers seems to me highly doubtful. Indeed to labor this point, as the majority would have the trial judge do, might well give it undue emphasis and create confusion where none already exists. Such questions of emphasis and detail should be left to the sound discretion of the district judges, especially where the parties suggest nothing which is any better than the language used.

This accident occurred on May 19, 1950. Five years later the trial took place from April 19 to May 6, 1955. Now after six years my brothers reverse and require a retrial because the district judge should have put a few more words on the other side of the scales. I must say that I think we usurp the function of the District Court and do small service to the sensible and orderly disposition of its civil business to reverse this judgment against the Pennsylvania Railroad.