Wilfred L. MILLER et al., Plaintiffs,

v.

PENNSYLVANIA RAILROAD CO., Defendant.

Civ. A. No. 1520–55.

United States District Court District of Columbia.

April 30, 1958.

Sheldon E. Bernstein and Wilmer S. Schantz, Jr. (of Newmyer & Bress), Washington, D. C., for plaintiff Miller.

Arthur S. Feld and Charles J. Rose, Washington, D. C., for intervenor plaintiff Alban Tractor Co.

James C. McKay and George Blow, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is an action to recover damages caused to a combined trailer, bulldozer and earth scraper, as a result of their being struck by the defendant's train at a railroad crossing on which this machinery was stalled. After a trial on the merits, the jury rendered a verdict in favor of the plaintiff Miller in the sum of $12,350; and in favor of the intervenor plaintiff, Alban Tractor Company, which had a financial interest in the equipment, for the sum of $7,250. The case is now before the Court on the defendant's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial.

The trial took place before Judge Kirkland and a jury. Unfortunately he departed this life between the time of the trial and the hearing of the motion. The Chief Judge of this Court then assigned the matter to this writer in accordance with Rule 63 of the Federal Rules of Civil Procedure, 28 U.S.C.A., which reads as follows:

"Rule 63. *Disability of a Judge.* If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other

636

reason, he may in his discretion grant a new trial."[1]

Manifestly, the judge to whom such a proceeding is assigned because of the death of the trial judge, finds himself in a position of considerable delicacy, as he has to perform the somewhat invidious function of reviewing the rulings of a judge of co-ordinate jurisdiction. Moreover, under some circumstances he may be handicapped by the fact that he did not hear the evidence and did not see the witnesses and is not in touch with the atmosphere surrounding the trial. He must needs rely solely on the transcript of the proceedings. Nevertheless, the task cannot be avoided and the duty must be fulfilled if practicable.

█ It is well established that if the trial judge dies after the jury returns a verdict but before a motion for judgment notwithstanding the verdict or a motion for a new trial is heard or decided, another judge may pass upon such applications. The latter then becomes vested with the same broad discretion to grant or deny such motions as was the trial judge.[2] An exception arises only if the successor judge finds that he cannot satisfactorily perform such a function by reason of the fact that he did not preside at the trial, or for some other reason. No such unusual situation emerges in the case at bar. This case is not within the exception.

█ A consideration of this matter must start with the premise that rulings of the trial judge are presumed to be correct, and that the burden is on the defeated party to demonstrate the contrary. This doctrine governs appellate review. A fortiori it is applicable to post-trial motions made in the trial court.

█ It is also necessary to bear in mind the necessity of undertaking the task in the spirit of what is known as the "harmless error" rule, i. e., Rule 61

of the Federal Rules of Civil Procedure, which reads as follows:

"Rule 61. Harmless Error. No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." (Emphasis supplied.)

This rule is quoted and must be stressed because unfortunately its mandate, in fact its very existence, is frequently overlooked and at times even forgotten. It must not be permitted to wither and atrophy. It will not do to render purely lip service to this basic doctrine of modern administration of justice. We must not "keep the word of promise to our ear, and break it to our hope". Philosophically, rules of law are but a means to an end and not an end in themselves. Their objective is the achievement of substantial justice.

It may be interesting to observe that a parallel principle exists in English procedure in connection with appellate review. It is found in Order 39, Rule 6, of the Rules of the Supreme Court,[3] and reads as follows:

"A new trial shall not be granted on the ground of misdirection or of the improper admission or rejection of evidence, or because the verdict of the jury was not taken upon a question which the judge at the trial was not asked to leave to them, un-

1. Rule 25 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., is similar to the rule quoted in the text.

2. Magee v. General Motors Corp., 3 Cir., 213 F.2d 899; Connelly v. United States, 8 Cir., 249 F.2d 576, 578–580.

3. The Annual Practice 1956, published by Sweet & Maxwell, Ltd.

*less* in the opinion of the Court of Appeal *some substantial wrong or miscarriage has been* thereby *occasioned; * * *.*" (Emphasis supplied.)

The instant case has been tried twice. At the first trial, which was conducted by this writer, the Court directed a verdict in favor of the defendant at the close of the plaintiffs' case, on the ground that no negligence on the part of the defendant had been shown. The judgment was reversed by the Court of Appeals by a vote of two to one on the theory that the evidence adduced by the plaintiffs could have "been found by the jury to have made out a case of negligence on the part of the Railroad * * * in the failure to bring the train to a stop when the peril of Miller was or should have been seen." [4]

The case was then retried before Judge Kirkland and a jury. In the light of the opinion of the Court of Appeals, the issues were submitted to the jury, which rendered a verdict for the plaintiffs as indicated. Obviously, the case is at present in a different posture than it was at the conclusion of the first trial, since the evidence for both sides has now been heard instead of only the evidence adduced in behalf of the plaintiffs. A reading of the transcript of the proceedings at the second trial indicates that there was no substantial conflict as to the salient facts. The disagreement between the parties was limited to the inferences to be drawn from the undisputed evidence and related largely to the steps that should have been taken under the circumstances by the various persons involved in the lamentable collision.

The facts are as follows. The plaintiff Miller was a grading and excavating contractor. On the day in question he was moving his machinery, which consisted of what is colloquially known as a "bulldozer", loaded on a motor-driven trailer, and an earth scraper attached to the latter. The equipment was long and heavy, its length being about 70 feet.

The floor of the trailer reached lower and was closer to the ground than is true of ordinary motor vehicles. In the course of moving the equipment, the plaintiff slowly proceeded across the tracks of the Pennsylvania Railroad Company, the defendant in this action, at a grade crossing near Lanham, Maryland. This crossing was approached by a minor country road. Another route was available to the plaintiff, over a state highway, which would have afforded an opportunity to move the equipment safely over a viaduct instead of at grade. Nevertheless the plaintiff chose the former itinerary.

As the equipment was progressing through the intersection and after it had partially cleared the tracks, the front of the trailer was impaled on a slight rise in the ground, due to the fact that the clearance between the floor of the trailer and the ground was unusually small. The engine stalled. The plaintiff and his helper made frantic and energetic efforts to start the engine and to force the equipment over the obstruction, but to no avail. The watchman, who guarded the crossing, was standing at his accustomed post near the tracks, holding a manual semaphore signal, which he employed to stop drivers of crossing vehicles or to wave them across when the intersection was clear, as conditions required. Apparently he was closely observing what was happening. About forty-five seconds elapsed. Such a period of time naturally can pass very rapidly, especially under the pressure of great stress and severe strain. Then a buzzer began to sound in the watchman's shack or booth, which was located near the track. It signalled the approach of a train from the north. The watchman immediately directed the plaintiff and his helper to leave the cab of the trailer. They promptly did so, and stood helplessly at the side of the railroad tracks. Almost instantaneously, after ordering the plaintiff and his helper to a safe place, the watchman started to run along the side of the tracks, at the same time unfurling

4. Miller v. Pennsylvania R. Co., D.C.Cir., 251 F.2d 376, 379.

a red flag which he held in his hand, and waving it, in the hope of signalling the train to stop.

In the meantime, an express train rushing at the rate of 80 miles an hour, the authorized speed at that point, had rounded a curve located 3,190 feet north of the intersection which then first appeared in the line of vision of the locomotive engineer and the fireman. Each of them saw that there was some obstruction on the track. They assumed that a vehicle of some kind was moving over the intersection and would clear the crossing before the train reached it. A few more seconds passed, and then both the engineer and the fireman suddenly realized that what seemed to be a vehicle, or a structure of some kind on the track, was at a standstill. They apparently were startled and horrified. The engineer immediately pulled the emergency brake. All that this move accomplished, however, was to reduce the speed of the train by 10 or 15 miles an hour, by the time when it hit the plaintiffs' equipment with full force, smashing it into bits. The force of the impact caused the locomotive to leave the tracks and roll along. The train was derailed. The engine swayed back and forth. Fortunately it did not turn over but gradually came to a stop. Fortunately, too, the engineman managed to extinguish the fire in the engine. It was little short of a miracle that neither the engineer nor the fireman sustained any serious injuries. To the plaintiff the wreck was a tragedy. The catastrophe would have been immeasurably worse if there had been a loss of life.

The plaintiff brought suit to recover damages to his equipment. The railroad counterclaimed for damages caused to its rolling stock. At the first trial, since a verdict was directed in favor of the defendant at the close of the plaintiffs' case, the railroad did not introduce any evidence in its behalf. Consequently the facts as to what transpired in the engine and as to what was done by the engineer and the fireman were not before the court. The testimony was confined to the events that took place at the intersection.

At the first trial the plaintiffs predicated their charge that the defendant was guilty of negligence constituting the proximate cause of the collision, on three grounds. First, it was contended that the railroad company was guilty of negligence in failing to construct the crossing in a manner that would have rendered it absolutely level, and would have eliminated the slight rise on which the plaintiffs' apparatus became lodged. Second, it was claimed that when the plaintiffs' machinery was stalled, the watchman should have promptly returned to his shed, picked up a fuzee, which was part of the equipment with which he had been supplied, lighted the fuzee and thrown it on the tracks, thereby igniting a red flame as a signal to the train to stop. It was argued that such a signal would have been visible for a considerable distance. Third, it was urged that the engineer should have begun to slow down the train at the very moment when he first saw the obstruction and that if he had done so, the train could have been brought under control prior to the accident. The trial court overruled each of these contentions and held that a prima facie case of negligence had not been made out. It thereupon directed a verdict for the defendant. In that posture of the case, it was unnecessary to pass upon the defense of contributory negligence.

The ruling of the trial court was supported by the decisions of the Second Circuit in Woodington v. Pennsylvania Railroad Co., 236 F.2d 760, and of the Third Circuit in McDonald v. Pennsylvania R. Co., 210 F.2d 524. Both of these cases arose out of the same accident, which was very similar to the one that occurred in the case at bar. A motor-powered crane was stalled on railroad tracks at a grade crossing and was struck by a train. Unfortunately, unlike the episode involved in the instant case, the railroad engineman was seriously injured and the fireman was killed. In the Woodington case, an action was institut-

ed by the engineman against the owner of the crane and the railroad company to recover damages for personal injuries sustained by him. In the McDonald case, a similar suit was brought by the executrix of the fireman's estate to recover damages for wrongful death. The facts were parallel to those presented in the instant case. The engineman saw the crane before approaching the crossing, but assumed that it was moving. When he realized that it had stalled, he promptly applied the brakes, but was unable to stop the train before crashing into the heavy apparatus. In each instance, it was held that there was no negligence on the part of the railroad engineer, but that the owner of the crane was to blame in taking the risk of crossing railroad tracks at grade when another route through an underpass was available. In the McDonald case, Judge Biggs observed that, "a man was killed by reason of a senseless accident caused by the indifference of the employees of a large contracting company, * * *"[5] Judge Clark in the Woodington case quoted these remarks with approval.

In the case at bar, the Court of Appeals agreed with the trial court that the first ground of alleged negligence had not been established, namely, that the railroad had not been guilty of any negligence in the construction of the crossing. It was held that in this regard the railroad was only under a duty to construct and maintain the crossing in such a manner that it would be safe for the usual and ordinary vehicles. The Court of Appeals further ruled, however, that a *prima facie* case of negligence requiring the defendant to introduce its evidence had been made out as to the third claim, namely, that the railroad employees had been guilty of negligence in failing to take immediate steps to bring the train under control at the instant when the obstruction hove into view. In its opinion, the court did not discuss or cite the McDonald and Woodington cases, supra. Unfortunately, the Court of Appeals gave no indication of its views as to whether the second ground of alleged negligence, namely, the failure of the watchman to light a fuzee instead of running and waving a red flag, had been sustained. The opinion was silent on this point and this circumstance gave rise to one of the controversies at the second trial. We shall later revert to this point at greater length.

■ In any event, it became the law of the case as enunciated by the Court of Appeals that the plaintiff had made out a *prima facie* case for submission to the jury. Judge Kirkland conducted the trial with painstaking care within the framework of the opinion of the Court of Appeals. The plaintiffs' evidence at the second trial was substantially the same as that which had been introduced in their behalf at the first hearing. To be sure, at times a *prima facie* case may be destroyed or demolished by evidence later introduced in behalf of the defendant. This was not true in this instance. Consequently in the light of the ruling of the Court of Appeals, the trial judge was in duty bound not to direct a verdict for the defendant, but to submit the issues to the jury. His action in this regard was clearly correct. He also left to the jury the question whether the plaintiff was guilty of contributory negligence. This matter, however, does not require discussion. Accordingly, the motion for judgment notwithstanding the verdict must be denied, since such a motion may be granted only if the court should have directed a verdict in favor of the moving party at the close of the trial.

The motion for a new trial, which will now be considered, is predicated on a two-fold basis. First, it is urged that the trial judge committed certain errors of law. Second, it is contended that the verdict was contrary to the weight of evidence. The latter point was stressed on the oral argument.

■ In connection with the first phase of the motion, it is urged that the

**5.** 210 F.2d at page 530.

trial court erred in admitting evidence in support of the charge that the watchman acted negligently in failing to light a fuzee instead of running alongside of the track waving a red flag, and in submitting this issue to the jury. As has already been noted, the opinion of the Court of Appeals specifically holds that no negligence in the construction and maintenance of the crossing had been shown. It further expressly indicates that the issue of negligence of the engineer in failing to stop the train should have been submitted to the jury. It is silent on the question whether the remaining ground of negligence urged at the first trial, namely, the failure of the watchman to light a fuzee, had been made out. This gave rise to a somewhat perplexing and even baffling problem. It was urged by defense counsel at the second trial and is now argued that since the Court of Appeals mentioned only the alleged negligence of the engineman in failing to stop the train, the opinion should be construed as holding by implication that there was no sufficient evidence of negligence of the watchman. On the other hand, plaintiffs' counsel urged at the second trial and reiterates now that since the Court of Appeals expressly held that no negligence was shown in the construction and maintenance of the crossing and remained silent as to the alleged negligence of the watchman, the latter issue was open and was properly submitted to the jury. Candor requires one to state that both arguments are plausible. The trial judge adopted the plaintiffs' view. This writer cannot conclude that he erred. In case of doubt, it is the recognized procedure to submit an issue of fact to the jury. It should be taken away from the jury and a verdict directed in respect to it, only if it is clear that the matter should be determined as a question of law.

■ It is next urged that the trial court erred in submitting to the jury the doctrine of the last clear chance, and that in any event the court incorrectly defined this principle. The Court of Appeals, however, in the closing sentence of its opinion, referred to the doctrine of the last clear chance as being possibly applicable in this case. It follows, therefore, that the trial judge acted correctly in instructing the jury on this subject. It can hardly be said that the evidence introduced in behalf of the defendant at the second trial took the issue out of the case as a matter of law. So too, the criticism of Judge Kirkland's definition of the doctrine of the last clear chance is not well founded. Defense counsel object to so much of the instruction as would permit the principle to be invoked if the defendant's employees realized or should have realized the plaintiff Miller's position of peril. It is argued that this instruction should have been limited to a situation in which the plaintiffs' peril was actually observed by defendant's employees. The Court of Appeals, however, expressly stated that the doctrine of the last clear chance might be applicable because of the failure to bring the train to a stop when the plaintiffs' peril was, or should have been, seen.

In conclusion, all contentions of the defendant in respect to alleged errors of law claimed to have been committed by the trial judge are rejected. This writer finds no error in any of his challenged rulings. It now becomes necessary to examine the assertion made on the oral argument that the verdict of the jury was contrary to the weight of evidence. On this aspect of the matter different considerations come into play. Here we are not aided by any expressions on the part of the deceased trial judge.

■ There is a clear distinction in principle between a motion for a directed verdict and a motion for a new trial on the ground that the verdict is against the weight of evidence,—a distinction that is sometimes misunderstood or overlooked. A verdict may be directed only if, as a matter of law, on the evidence presented the moving party is entitled to judgment in its favor. A motion for judgment notwithstanding the verdict may, of course, be granted only if a verdict in favor of the moving party should have been directed at the close of

the entire case. On the other hand, the court may conclude that an issue of fact exists requiring the submission of the question to the jury as a matter of law, and yet upon a return of the verdict may find that the verdict was contrary to the weight of evidence. In such a situation the court may grant a new trial. Manifestly the consequences of these two courses are entirely different. A directed verdict or judgment notwithstanding the verdict results in a final disposition of the case. An order granting a new trial, as its very name indicates, merely leads to a re-trial before another jury. If two juries reach the same result, a court would naturally hesitate to require a further scrutiny of the issues by a third jury. The actual effect of this procedure consists of a check by a second jury of the determination made by the first jury.

Obviously, on a motion for a new trial on the ground that the verdict is against the weight of evidence, the power of the court is much broader than on a motion for a directed verdict, or for judgment notwithstanding the verdict. On such an application the court may weigh the evidence. If the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted. Manifestly this authority should be exercised sparingly and cautiously. It should be invoked only in cases in which the evidence preponderates heavily against the verdict. Nevertheless recourse should be had to it, if the ends of justice so require.

Thus in Metropolitan Railroad Co. v. Moore, 121 U.S. 558, 570, 7 S.Ct. 1334, 1340, 30 L.Ed. 1022,—a case which originated in the District of Columbia—, this topic was discussed as follows:

"So, upon the whole evidence in the case, the testimony in support of the cause of action, or of the defence, may be so slight, although competent in law, or the preponderance against it may be so convinc-

ing, that a verdict may be seen to be plainly unreasonable and unjust. In many cases it might be the duty of the court to withdraw the case from the jury, or to direct a verdict in a particular way; and yet in others, where it would be proper to submit the case to the jury, it might become its duty to set aside the verdict and grant a new trial. That obligation, however, is the result of a conclusion of fact, and in such cases the ground of the ruling is, that the verdict is not supported by sufficient evidence, because it is against the weight of the evidence."

Excellent explanations of this subject are contained in several opinions of Judge Parker of the Fourth Circuit. One of them is found in Garrison v. United States, 62 F.2d 41, 42:

"There seems to be some confusion on the part of counsel as to the difference between the duty to direct a verdict and the duty to grant a new trial after verdict; and the contention is frequently made that the judge should direct a verdict whenever the evidence is such that he would be justified in setting the verdict aside. The distinction, however, is clear. Where there is substantial evidence in support of plaintiff's case, the judge may not direct a verdict against him, even though he may not believe his evidence or may think that the weight of the evidence is on the other side; for, under the constitutional guaranty of trial by jury, it is for the jury to weigh the evidence and pass upon its credibility. He may, however, set aside a verdict supported by substantial evidence where in his opinion it is contrary to the clear weight of the evidence, or is based upon evidence which is false; for, even though the evidence be sufficient to preclude the direction of a verdict, it is still his duty to exercise his power over the proceedings before him to prevent a miscarriage of justice."

Again, in Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350, 352–353, 354, Judge Parker wrote as follows:

"\* \* \* it is the duty of the judge to set aside the verdict and grant a new trial, if he is of opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right.

\*     \*     \*     \*     \*     \*

"To the federal trial judge, the law gives ample power to see that justice is done in causes pending before him; and the responsibility attendant upon such power is his in full measure. While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require." [6]

In the case at bar there is no conflict in the testimony on vital questions of fact. The issues do not depend on credibility of witnesses to any considerable degree. The ultimate question is whether it was reasonable for the jury to deduce the inferences that it apparently drew from the uncontradicted evidence. An opportunity to observe the witnesses and to appraise their credibility, therefore, plays very little part in this case. The matter can be determined by a scrutiny of the record.

Under the instructions of the trial court, the jury was permitted to predicate negligence either on the failure of the watchman to light a fuzee, or on the failure of the engineer to bring the train to a stop, or both. About forty-five seconds elapsed from the time when the plaintiffs' machinery was stalled on the track to the moment when the buzzer in the watchman's shack began to announce the approach of the oncoming train. Obviously, it was too late then for the watchman to return to the shack, take out a fuzee, light it and throw it on the track. At least several seconds would have been consumed in so doing. According to the testimony several more seconds would have expired from the time when the fuzee was first ignited until its flame became red. It is only the red flame of the fuzee that would constitute a signal to the train to stop. The undisputed evidence is that during the first few seconds a fuzee burns with a white or yellow flame, which later turns red. By that time the train would have reached the intersection. The watchman, instead of returning to his shack for a fuzee, immediately started running alongside of the track in the direction of the train and kept waving a red flag. The fact that his action proved ineffective does not necessarily justify a finding that it was negligent.

■ It was strongly urged on the oral argument of this motion, however, that the watchman should not have waited, but should have placed a fuzee on the track as soon as he saw that the plaintiffs' apparatus had become stalled. It was urged that if he had done so, the red flame of the fuzee would have been burning by the time the train had rounded the curve and the intersection came into the line of the engineer's vision. No evidence was introduced, however, showing what was the common or usual practice in connection with the use of fuzees by crossing watchmen in an emergency of this kind, or at what juncture or under what conditions a fuzee is ordinarily lighted. Under the circumstances, it would seem unreasonable for a jury to find that the watchman was guilty of negligence in waiting considerably less than a minute while the plaintiff and his helper were still making

6. This writer had occasion to discuss the subject of motions for a new trial and review the authorities at some length in United States v. Robinson, D.C., 71 F. Supp. 9.

frantic efforts to start their machinery. Evidently they had not given up hope of dislodging the equipment from the tracks and moving it away from the intersection.

██ We now turn to the other aspect of the matter, namely, whether it was contrary to the weight of the evidence to find that the engineman was guilty of negligence in failing to stop the train. The plaintiffs' contention was that the engineman should have begun to reduce speed and gradually brought the train to a stop immediately upon seeing the vehicles at the intersection about 3,100 feet away, even before he was able to realize that they had stalled on the tracks. In this connection it is essential to consider his testimony, as well as that of the fireman. Their simple and unadorned yet vivid narratives can be described as being almost terrifying. The engineman testified as follows: [7]

"So that as near as I can tell you I was turning the bell on when I saw something down on the crossing. And that is not unusual, because I often, or rather most every trip I run, I see an automobile or a truck crossing the track before the engine reaches the whistling post. And I am not alarmed, as long as he gets across there by the time I get to the whistling post.

"And looking down there I saw this object, and couldn't tell what it was. It looked like something different than probably a truck, and I kept watching it. And when I came to the whistling post I started one long blast of the whistle, which would have been the first of four blasts. The fourth one would have ended at the crossing.

"While I was blowing the first blast of the whistle, toward the end of it, I could still see him, and I thought it was taking him too long to get across. I leaned forward to get a better view of him, and I saw

the curved iron on the trailer, curved up. They were not moving. And I just reached—pshow—and I said, 'Graham [referring to the fireman], there is something on that crossing down there, and he isn't moving.'

"And I stood up there. That is when I stood up, after telling him the first time. And I looked again and I saw this heavy tractor on there, and I said, 'He isn't moving.' And I said the third time, 'He isn't moving.' and 'we are going to hit him.' And bang, we hit him.

"The engine seemed to leap in the air, and from there on it was just bouncing and rocking from side to side, for three-quarters of a mile or more, and down the track. I heard air blowing out the side, outside of the cab. And right after the crash I pushed my panograph down and opened the switch and put the fire out in the boiler—that is an emergency switch—and heard this air blowing outside the cab. I reached over and shut the bell off, thinking I would save some air, and I didn't save any.

"And my next thought was, 'Well, we haven't turned over yet; so I don't think the engine will go much further, and it will stop.' And we went up over that little bridge and started to go down the grade again; and that is more than a mile to the bottom of that hill. And I thought it wasn't slowing down as much as it should. And I looked at my air gauge, and all my air is gone.

"Q. What had happened to your air? A. I had one side sliced off of the brake hose on the front engine truck. All the air went out of there. And something had gone through the front of the engine on the right side, near the front, and out a big hole in the casing, had smashed the distributing valve and the hand brake. And there was an-

7. Transcript, pp. 450, 451, 452, 453.

**644**

other big hole on the other side. And then there were several smaller holes—I don't remember how many of the smaller ones—cutting the casing.

"Q. Do I understand you had lost your brakes after the collision?

\* \* \* \* \* \*

"A. I had lost the brake on the engine.

"Q. And how many cars were with you when you finally stopped? A. I had one car when I stopped.

"Q. Now, Mr. Hodges, in showing us and telling us what you did, you demonstrated to the jury and then you made a loud hissing sound a while back. Now what I would like you to tell us is what you did, what were you doing when you made this motion and made that—A. When I pulled that emergency, I just grabbed the handle and pulled it right around as far as it would go, and it said, 'Pshowie.'

"Q. Was that the brake going into emergency? A. That is the brake going into emergency.

"Q. And did you feel the brake take hold? A. I felt the brake take hold, yes, sir.

"Q. Did it slow the engine down? A. It slowed the engine down some, yes, sir.

"Q. Now where was the engine and where were you when you first realized that the vehicle or the equipment on the track wasn't moving? A. That was while I was blowing the first blast of the whistle. I hadn't had a clear view yet. I couldn't tell whether he was moving or not. I leaned forward. And while I was leaning forward, it was about the end of the first blast of the whistle, or possibly the beginning of the second—but I think the end of the first blast of the whistle—I saw they were not moving.

"Q. And how soon after that did you throw it into emergency? A. Just as soon as I could grab the handle and pull it around there."

The testimony of the fireman was similar:[8]

"I started to sit down and glance ahead, and I observed something there. And this involved a couple of seconds here and there. I saw something ahead in the vicinity of the road crossing. I mean by that, you can't determine exactly whether or not it was on the road crossing, at that distance, until you have taken a second look, so to speak.

\* \* \* \* \* \*

"A. So upon seeing this object, I naturally would take a second look. And, like I stated a moment ago, it is not unusual to see some vehicle in that vicinity of that crossing. But at the same time you can't immediately assume that something is on the track and holler to the engineer to *throw it in emergency, and possibly endanger the people on the train.*[9]

"Q. Tell us what you did or saw, sir. A. As soon as I saw it, I looked the second time and whirled to holler at him.

"Q. To holler at whom? A. My engineer. And almost then just spontaneous—in fact, he sort of beat me to it—he hollered, 'There is something on the track,' or something of that nature. And I remember hollering 'Yes', or 'Yea', or something like that. And at the same time, I believe, as near as I can recall, he says, 'It is not moving,' and just immediately the brake was dumped.

"Q. The brake was 'dumped'? A. That is an expression. It was thrown in emergency. We say 'dumped'. It lets the air escape.

8. Transcript, pp. 566, 568-569.

9. Emphasis supplied.

"Q. Did you feel the brake take hold? A. Yes, sir.

"Q. Could you tell whether the train slowed down between the time the brake was thrown and the time of the collision? A. Yes, it slowed down."

It must be emphasized that in weighing the actions of the engineer and the crossing watchman, we are dealing with events that rapidly succeeded each other kaleidoscopically in a matter of seconds and in a moment of emergency when there was no time or opportunity for calm reflection or careful deliberation. They should not be weighed in the light of hindsight. Then, too, as a matter of human psychology, allowance must be made for reaction time and following that, there must be an interval, no matter how brief, before a mechanical device responds to the person who brings it into operation. The evidence does not justify a finding that there was any carelessness on the engineer's or the watchman's part, or that they should have acted otherwise than they did. Moreover, it would be unreasonable for a jury to find that whenever a train engineer observes a vehicle at an intersection some distance away, he has no right to assume that it is moving and will clear the crossing in due time, but must slow down and even bring the train to a stop. Modern railroading would be impracticable and train schedules could not be maintained if such a practice were imposed on the operation of trains.[10] There is no evidence that it is the standard or the customary practice.

Continuous experience with trials by jury leads to a mounting sense of admiration of the results attained by them, and of the type of justice that is generally meted out in this manner. This writer is of the opinion that juries infrequently make mistakes and he rarely sets a verdict aside. Nevertheless, no human being is infallible. All occasionally make mistakes. For this reason, rulings on questions of law by trial judges are subject to review by appellate courts, while results of jury trials are subject to correction on motions for a new trial. This court is of the opinion that in this case the verdict of the jury was unreasonable and contrary to the overwhelming weight of evidence.

The motion for judgment notwithstanding the verdict is denied, and the alternative motion for a new trial is granted on the ground that the verdict was contrary to the weight of evidence.

10. In this connection Judge Biggs' opinion in McDonald v. Pennsylvania R. Co., 3 Cir., 210 F.2d 524, and Judge Clark's opinion in Woodington v. Pennsylvania Railroad Co., 2 Cir., 236 F.2d 760, previously referred to in the text, are illuminating. Judge Biggs observed (210 F.2d at page 528): "The accident occurred because Groves' employees elected to cross the railroad's tracks at a grade crossing instead of making use of a closely adjacent highroad with an underpass. * * * The rejection of a safe overpass or underpass and the election to cross tracks at grade has been held to constitute negligence as a matter of law." In the instant case, a nearby route with an overpass was available, as heretofore stated.