UNITED STATES

v.

**Beth Koehler DIEHL.**

**Civ. A. No. 73–H–1017.**

United States District Court,
S. D. Texas,
Houston Division.

Aug. 6, 1978.

J. A. "Tony" Canales, U. S. Atty., Houston, Tex., Paul D. Barker, Tax Div., Dept. of Justice, Washington, D. C., for plaintiff.

Dougal C. Pope, Pope & Waits, Houston, Tex., for defendant.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

### I. INTRODUCTION

This action was commenced pursuant to the provisions of the Int.Rev.Code of 1954, § 7401,[1] to reduce to judgment an assessment of income tax liability. The defendant taxpayer in this case, Beth Koehler Diehl (hereinafter defendant), and Kent B. Diehl (hereinafter Mr. Diehl), now deceased, were married during the entire calendar year 1957, and they filed a joint income tax return for that year in July of 1958. The government's assessment, which was made on July 21, 1967, concerned four different transactions. The taxpayer concedes that one of the transactions resulted in income which should have been reported. She maintains, however, that the remaining three transactions did not result in taxable income. The facts of these three more complicated transactions are set out in detail under the Findings of Fact. For purposes of introduction, each of the four transactions are briefly described as follows:

a. During the calendar year 1957, Mr. Diehl received a check from one Kennedy Van Sauns in the amount of $9,000.00. This amount was paid to Mr. Diehl for services rendered. On their joint income tax return for 1957 defendant and Mr. Diehl reported the receipt of only $4,500.00 from Kennedy Van Sauns. Defendant concedes that the entire $9,000.00 should have been reported.

b. In January of 1957, the board of directors of the Texas Portland Cement Company (hereinafter Texas Portland) voted to issue 110,491 fully paid shares of capital stock to Mr. Diehl for services he rendered to the company in his capacity as engineer and president. Mr. Diehl received those shares in March of 1957. On the same day that Mr. Diehl took possession of the certificate representing these 110,491 shares, Mr. Diehl pledged the shares as collateral for a $200,000.00 line of credit to be made directly to Texas Portland. The parties dispute whether the circumstances surrounding the issuance of the 110,491 shares render the receipt of these shares taxable income under § 61.

c. In February of 1957 Mr. Diehl entered into a contract with A. N. Morgan and others wherein Mr. Diehl pledged 50,005 shares of Mississippi Portland Cement Company (hereinafter MVPC) capital stock in return for a loan of $35,000.00. The contract provided that the loan was to be repaid within three months, and further, that the lender was granted an option to purchase 25,000 shares for $25,000.00 any time within that three-month period. Repayment was not timely made, and the lender never exercised his option. However, on June 14, 1957, while the loan was in default, Mr. Diehl exchanged 25,000 shares for the forgiveness of $25,000.00 of his debt. The parties do not dispute that this constituted a sale of the stock and should have been reported. The dispute centers on

---

1. Hereinafter, all statutory references not otherwise designated refer to the Internal Revenue Code of 1954, as amended (Title 26, U.S.C.).

whether the transaction resulted in an unreported interest deduction which offsets any income generated by the transaction.

d. On June 14, 1957, Mr. Diehl entered into a contract with Bankers Life and Casualty Company (hereinafter Bankers Life). Mr. Diehl transferred title to the 25,005 shares of MVPC stock in exchange for $40,000.00. The contract required Mr. Diehl to repurchase 23,672 of the shares for $75,015.00 within one year. Again, the parties do not dispute that this resulted in a taxable sale which the Diehls should have reported. Again, the dispute centers on whether any unreported income is offset by unreported interest deductions.

This case was tried before Senior Judge Ben C. Connally, in November of 1975, and the parties agreed that the case should be submitted to the jury solely on the issue of fraud, reserving all questions of law for the Court's determination. The Court submitted the case to the jury in four interrogatories on the issue of fraud as to each transaction, and the jury found that the failure to report the $4,500.00 commissions received, as well as the receipt of the 110,491 shares of Texas Portland capital stock constituted fraud. After trial and prior to determining these legal questions, Judge Connally died, and this cause was transferred to the docket of Judge Carl O. Bue, Jr. Shortly after this transfer, the parties filed a joint stipulation agreeing to submit all issues of fact not submitted to the jury as well as all issues of law to this Court for determination based on the record. Pursuant to Rule 63, F.R.Civ.P., this Court therefore had authority to determine all unresolved questions of fact and law, and entertain any motions related thereto. *See Miller v. Pennsylvania R. Co.*, 161 F.Supp. 633 (D.C.D.C.1958).

The Court concluded, however, that the complications of this lawsuit required a hearing by this Court, notwithstanding the duplication of efforts which would be necessitated by a de novo determination of the questions of fraud. Accordingly, this action was retried by this Court beginning on June 1, 1976, and lasting three days.

The Court has concluded that all of the aforementioned transactions resulted in taxable income not reported in the Diehls' 1957 joint income tax return. The Court has also concluded that the evidence presented at this second hearing was sufficient to establish clearly and convincingly that the income generated by (a) the receipt of the $9,000.00 commissions, and (b) the issuance to Mr. Diehl of the 110,491 shares of Texas Portland stock was fraudulently omitted from the joint income tax return filed by Mr. and Mrs. Diehl for tax year 1957.

## II. THE "PROOF OF FRAUD" REQUIREMENT

To avoid the three year statute of limitations imposed by § 6501(a), it was the government's burden to prove by clear and convincing evidence that the failure to report income generated by at least one of the four transactions discussed above constituted fraud. Proof of fraud as to any one of the alleged deficiencies permits a general reaudit of the return in its entirety, and the statute of limitations is tolled as to all deficiencies. *Lowy v. Commissioner of Internal Revenue*, 288 F.2d 517 (2d Cir. 1961) (L. Hand, J.), *cert. denied*, 368 U.S. 984, 82 S.Ct. 596, 7 L.Ed.2d 523 (1961). *See also Bahoric v. Commissioner of Internal Revenue*, 363 F.2d 151, 153 (9th Cir. 1966); *Worcester v. Commissioner of Internal Revenue*, 370 F.2d 713, 717 (1st Cir. 1966).

It is important to note that the government's purpose in seeking to prove fraud in this case is limited solely to avoidance of the three year statute of limitations. Although the fifty percent fraud penalty assessed in this case constitutes some part of the government's total assessment, under the provisions of § 6653(b), it cannot be collected from Mrs. Diehl because the evidence in the record is insufficient to establish her participation in any of the four transactions found by this Court to be fraudulent. However, the Court has concluded that the evidence of fraud on the part of Mr. Diehl is amply supported by the record, and Mrs. Diehl is jointly and sever-

ally liable for any tax liability due to omissions from the Diehl's joint return. *E. g., Hicks Co. v. Commissioner,* 56 T.C. 982, 1030 (1971), *aff'd,* 470 F.2d 87 (1st Cir. 1972).

## III. INAPPLICABILITY OF THE "INNOCENT SPOUSE" PROVISION: SECTION 6013(e)

■ There is insufficient evidence in the record to establish that defendant is entitled to be relieved from all tax deficiencies here at issue as an "innocent spouse" under § 6013(e). In the first trial of this cause before Judge Connally defendant made no attempt to assert this provision. Due to the peculiar nature of this action this Court considered it appropriate to direct counsel in a minute entry to brief the possible applicability of this provision. To qualify under § 6013(e) as an innocent spouse, a party has the burden of proving, among other things, that "in signing the return he or she did not know of, and had no reason to know of, such omission . . ." 26 U.S.C. § 6013(e)(1)(B). *See Allen v. Commissioner of Internal Revenue,* 514 F.2d 908, 912 (5th Cir. 1975).

In the second trial before this Court, defendant again made no effort to assume her burden of establishing the applicability of § 6013(e). Accordingly, the Court has concluded that statutory relief for defendant due to her nonparticipating role in the fraudulent transactions must be limited to relief under § 6653(b) from that part of the total assessment attributable to fraud penalties.

## IV. LEGAL SUFFICIENCY OF AMOUNT FRAUDULENTLY EVADED

■ With respect to the unreported $4,500.00, defendant has cited four criminal tax fraud cases for the proposition that the government must prove that the income fraudulently omitted was a "substantial" amount. In all four cases cited the court affirmed the conviction of a taxpayer in a criminal tax fraud case who argued that the government had not proved the amount alleged in the indictment. In each case the court ruled that the government in a criminal tax fraud case need only show that a

"substantial" amount of tax liability alleged was willfully evaded. *See United States v. Beasley,* 519 F.2d 233, 245 (5th Cir. 1975); *Harris v. United States,* 356 F.2d 582, 585 (5th Cir. 1966); *United States v. Burdick,* 221 F.2d 932, 934 (3d Cir. 1955), *cert. denied,* 350 U.S. 831, 76 S.Ct. 65, 100 L.Ed. 742 (1955); *Sasser v. United States,* 208 F.2d 535, 539 (5th Cir. 1953). The Court is of the opinion that the taxes attributable to the $4,500.00 omitted from defendant's return are sufficiently substantial to support the Court's finding of fraud with respect to this term of income. It should be noted that the omitted $4,500.00 is only one of the four items of fraudulent deficiency alleged by the government. Certainly it is not necessary that each item alleged by the government be substantial in amount. Moreover, any requirement of substantiality necessary to warrant a conviction for criminal evasion of taxes under § 7201 would have no application in a civil suit to recover tax deficiencies, where the fraud is proved for no other purpose than to toll the statute of limitations and permit a reaudit for any taxes due and owing for the tax year in question.

## V. EVIDENTIARY OBJECTIONS RAISED DURING AND AFTER TRIAL

In bringing this action the government was required at trial to produce evidence in three general areas. Because of the statute of limitations problem mentioned earlier, it was necessary for the government first to establish that at least one of the deficiencies assessed was fraudulently omitted from the 1957 income tax return filed by the Diehls. It was also necessary to produce evidence establishing the fair market value of the Texas Portland shares received, and the MVPC shares disposed of during 1957. Finally, but to a lesser extent, it was necessary for the government to prove certain facts germane to legal questions of taxability.

During the course of trial, the government offered the testimony of Mr. Diehl, now deceased, which was taken during or pursuant to various proceedings involving

Texas Portland. *See* Government Exhibits 25, 26 and 27. The Court also permitted a government agent to read a memorandum prepared subsequent to an interview of the Diehls in August of 1960. Defendant has objected to the admission of Government Exhibits 25–27 on general grounds of hearsay and the Texas Dead Man's Statute. She has also objected to the reading of the memorandum of interview with the revenue agents. The Court has determined that Government Exhibits 25–27 were properly admitted into evidence, and that defendant's post-trial motion to strike the reading by Agent Naiser of the memorandum of interview must be denied.

### A. Transcripts of Mr. Diehl's Testimony in Other Lawsuits

Rule 402, Fed.R.Evid., provides:

"All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible."

In order for the government to prevail in this action, it was required to establish by clear and convincing evidence that Mr. Diehl intentionally omitted one of the four items charged herein. Therefore, any evidence which establishes or tends circumstantially to establish Mr. Diehl's state of mind, or his knowledge of the laws of taxation, is germane to this Court's threshold determination of the question of fraud. Thus, the testimony of Mr. Diehl is admissible unless otherwise objectionable by virtue of a constitutional, statutory, or regulatory provision.

### 1. The Texas Dead Man's Statute

■ Defendant first contends that the evidence is inadmissible as violative of the Texas Dead Man's Statute, Tex.Rev.Civ. Stat.Ann. art. 3716 (1925). This contention is wholly without merit. First, it is apparent from the language of Article 3716 that it applies only to "actions by or against executors, administrators, or guardians." Second, Dead Man Acts, which are remnants of common law disqualification of

parties and interested persons, now fall within the dictates of Rule 601, Fed.R.Evid., which provides that:

"[e]very person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law."

It is therefore clear that the applicability of state Dead Man Acts in federal court is limited to diversity actions. *Cf. Van Pendley v. Fidelity and Casualty Co. of New York*, 459 F.2d 251, 254–255 (5th Cir. 1972). *See also* 3 Weinstein, *Federal Rules of Evidence* ¶ 601.4 (1975).

### 2. Defendant's Hearsay Objections

#### a. Admissibility as a Vicarious Admission

■ In response to defendant's general hearsay objection which was made throughout trial as to any and all statements made by Mr. Diehl, the government first contended that such statements are no longer considered hearsay under the new Federal Rules of Evidence. Rule 801(d)(2)(D) in pertinent part provides that:

"A statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by his agent or servant concerning a matter within the scope of his agency or employment . . ."

*Citing* 4 Wigmore, Evidence §§ 1077–1080 (Chadbourn rev. 1972), the government argued that the joint income tax liability of Mr. and Mrs. Diehl renders any statement by Mr. Diehl a vicarious admission under Rule 801(d)(2)(D). The Court disagrees. While a husband or wife may become the agent of his spouse, Wigmore, *supra*, § 1078, it is apparent from the testimony of Mrs. Diehl at trial that the Diehl's divorce in October of 1959 antedated the transcript and interview testimony here sought to be excluded. It would be therefore wholly incongruous for this Court to premise the admissibility of this testimony on a relationship which had been extinguished at the time that the testimony was given.

### b. Admissibility as Statements Against Interest

The government alternatively argued that Mr. Diehl's prior testimony as well as statements in the August of 1960 interview with revenue agents Naiser and McKnight constituted statements against interest which were

> "so far contrary to [his] pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true."

Rule 804(b)(3), Fed.R.Evid.

The Court has concluded, however, that the transcribed testimony of Mr. Diehl sought to be admitted for this Court's consideration had self-serving as well as disserving aspects. From a standpoint of federal income tax liability, the statements were against the pecuniary interests of Mr. Diehl, and they subjected him to civil and criminal liability. However, in the context in which this testimony was given, many of the statements made by Mr. Diehl and considered here by this Court were made to establish Mr. Diehl's proprietary interest in the 110,491 Texas Portland shares. Thus, as to these statements, the usual guarantee of trustworthiness justifying the "statements against interest" exception to the hearsay rule is not applicable. C. McCormick, Evidence § 279 (2d ed. 1972).

To the limited extent that this Court has admitted and considered testimony by Mr. Diehl for the truth of the matters asserted, the Court has concluded that the requirements of Rule 804(b)(5), Fed.R.Evid., have been amply satisfied.

### c. Testimony Establishing State of Mind

This Court's exhaustive consideration of statements made by Mr. Diehl, as well as statements made to him by others was necessitated not by an attempt to resolve the questions of taxability, but rather, to determine the state of Mr. Diehl's mind at the time that the Diehl's joint income tax return was filed in July of 1958. The advice rendered to Mr. Diehl by various accountants and others throughout 1956, 1957 and 1958 as to the taxability of the receipt of the 110,491 shares in no way influences this Court's conclusions of law. Evidence of this repeated advice does, however, bear on Mr. Diehl's state of mind at the time that his tax return was filed. Likewise, the Court's finding that the $4,500.00 commissions and the 110,491 Texas Portland shares received by Mr. Diehl were fraudulently omitted from the Diehl's 1957 joint income tax return is predicated to a great extent by Mr. Diehl's testimony concerning these transactions. Since the proof in this instance does not rest its value upon the veracity of Mr. Diehl, it cannot be characterized as hearsay. Rule 801(c), Fed.R. Evid. See also C. McCormick, Evidence § 249 (2d ed. 1972).

### 3. Defendant's Motion to Strike Agent Naiser's Reading of a Memorandum of Interview

Rule 803(5), Fed.R.Evid., provides that a memorandum can be read into evidence by a witness if (a) the witness once had accurate knowledge of events which he no longer enjoys, and (b) the memorandum was made while the matter was fresh in the witness' memory. Defendant maintains that he was unable effectively to cross-examine Agent Naiser's recollection of this interview. This objection, however, must go to the weight rather than the admissibility of Agent Naiser's reading; otherwise, this objection would always preclude the reading of past recollections which have been recorded. The Court has concluded that the requirements of Rule 803(5) were properly met; defendant's motion to strike this testimony is therefore denied.

## VI. FINDINGS OF FACT

The following Findings of Fact set out the basis for this Court's conclusions that the four items of income described in Section I, *supra,* (1) constituted taxable income to the Diehls in 1957, and further, (2) that the failure to report the receipt of (a) the 110,491 Texas Portland shares and (b)

$4,500.00 of the $9,000.00 commissions received from Kennedy Van Sauns constituted fraud on the part of Mr. Diehl.

Also included in this amalgam of facts is the basis of this Court's opinion as to the valuation properly attributable to the Texas Portland shares received and the MVPC shares disposed of by Mr. Diehl in 1957.

### A. General Findings

1. During each of the years 1956, 1957 and 1958, Mr. Diehl and defendant were husband and wife residing in Orange, Texas.

2. The joint income tax return signed by defendant and her husband for tax year 1957 was filed on July 21, 1958.

3. Mr. Diehl fraudulently omitted, or caused to be omitted from the Diehls' joint return taxable income generated by the 110,491 Texas Portland shares and the $4,500.00 Kennedy Van Sauns commissions received by Mr. Diehl in 1957.

4. In October of 1959 defendant and Mr. Diehl were divorced in Mexico.

5. Mr. Diehl died in 1966 in California.

6. On July 21, 1967, the Commissioner made an assessment against defendant for unpaid personal income taxes for the tax year 1957 in the amount of $499,337.95, together with fraud penalties in the amount of $249,668.97, and interest in the amount of $277,625.06. Presently in dispute before this Court is the sum of these amounts, $1,026,631.98, together with the interest which has accrued thereon to the present date.

7. Pursuant to § 6653(b), defendant is entitled to relief from the portion of the total assessment attributable to fraud; evidence in the record is insufficient to establish her participation in any of the four transactions found by this Court to be fraudulent.

8. During the tax year 1957, defendant was a licensed securities dealer. At some point during 1956 or 1957, she sold shares of Texas Portland stock for $5.00 a share.

9. Evidence in the record is insufficient to satisfy defendant's burden under § 6013(e)(1)(B), of establishing that she did not know of and had no reason to know of any or all of the four fraud items set out herein. Defendant therefore is not entitled to relief from any tax liability as an innocent spouse under this provision.

### B. The $9,000.00 Commissions Paid to Mr. Diehl by Kennedy Van Sauns

10. On August 28, 1957, Mr. Diehl received $9,000.00 commissions from one Kennedy Van Sauns. Of this $9,000.00, Mrs. Diehl and her husband reported only $4,500.00 on their 1957 income tax return filed in July of 1958.

11. In August of 1960 in an interview before internal revenue agents Naiser and McKnight, Mr. Diehl stated that the failure to report $4,500.00 of the $9,000.00 received was due to an oversight caused by the fact that the $9,000.00 was received in two checks of $4,500.00 each. Agents Naiser and McKnight, and Mr. and Mrs. Diehl were present at that August of 1960 interview. With the exception of Mr. Diehl, all of the other parties to that interview testified in this cause. There is no evidence that any other explanation for the $4,500.00 was given at that interview.

12. The $9,000.00 commissions paid to Mr. Diehl and deposited in his bank account was received in the form of one check in the amount of $9,000.00.

13. Defendant does not dispute that the $4,500.00 omitted should have been reported on her 1957 income tax return. It is defendant's contention that Mr. Diehl had some sort of an oral agreement with a Mr. Calvin Huffman, as president of Industrial Management Corporation, to split fifty-fifty any unpaid commissions which Huffman succeeded in collecting from Kennedy Van Sauns on behalf of Mr. Diehl. Defendant argues that the omitted $4,500.00 was shrouded in the confusion of this oral agreement.

14. This agreement did not purport to reach monies received by Mr. Diehl from Kennedy Van Sauns which neither Huffman nor his corporation had any part in collecting.

15. Neither Huffman nor his corporation was at any time instrumental in any manner in the $9,000.00 payment to Mr. Diehl here in question. Neither Huffman nor his corporation at any time received any money in connection with the receipt of this $9,000.00 from Kennedy Van Sauns. Neither Huffman nor his corporation was successful at any time in collecting any unpaid commissions from Kennedy Van Sauns on behalf of Mr. Diehl.

## C. Issuance of the 110,491 Shares of Texas Portland Cement Company Stock

### 1. Findings Relating to Taxability and Fraud

16. In 1955, Mr. Diehl, along with other promoters of Texas Portland entered into a preincorporation agreement whereby, in return for services rendered to the corporation, Mr. Diehl was to receive 110,491 shares of stock in the company. In May of 1955 he received a certificate for 110,491 shares. This certificate was destroyed by Mr. Diehl in 1955 when it was learned that the Texas Securities Commission would refuse to permit the public sale of Texas Portland shares so long as the 110,491 shares were outstanding in Mr. Diehl's name. Mr. Diehl consulted with several tax specialists during the years of 1956 and 1957 regarding the tax aspects of receiving these shares.

17. On January 14, 1957, a special meeting of the board of directors of Texas Portland was held. A resolution was passed at that meeting awarding Mr. Diehl the issuance of 110,491 shares of fully paid capital stock in consideration for services he had rendered to the corporation as an engineer and as president. This issuance was subject to the condition that the shares be reserved until 90 days following commencement of operation.

18. Although full production did not commence until April of 1957, the 110,491 shares of stock were issued to Mr. Diehl on March 19, 1957. These shares were pledged to the American National Bank of Beaumont in exchange for a $200,000.00 line of credit running to Texas Portland.

19. The chairman of the board of Texas Portland, a Mr. Cullen F. McDougal, also pledged 70,000 shares to the bank in order to secure the $200,000.00 line of credit, making a total of 180,491 shares pledged. On either March 19 or March 20, 1957, Mr. McDougal, Mr. Diehl and a Mr. James Knott went to the American National Bank to the office of a Mr. Brooks Hollyfield, executive vice president of the bank. At this meeting papers necessary to establish the line of credit were executed.

20. In Mr. Diehl's written pledge to the bank, the following paragraph was included:

> "11. Pledgor hereby covenants with the Bank that Pledgor is the legal and equitable owner of the securities hereby pledged, and that they are subject to no liens or encumbrances whatever . . .."

21. Mr. Diehl, Mr. McDougal and Texas Portland were each individually liable for the $200,000.00 line of credit.

22. As an added assurance the American National Bank also entered into an agreement with a wealthy businessman named Mr. S. Perry Brown whereby Mr. Brown would purchase the 180,491 shares of stock for $200,000.00 if called upon to do so. Mr. Brown was engaged in certain construction work with Texas Portland, and he had previously established a line of credit with the American National Bank.

23. A special meeting of the board of directors of Texas Portland met again on June 14, 1957; the original minutes of that meeting reflect that

> "the Company was in need of funds for operations on March 20, 1957; and the American National Bank required that Mr. Diehl's stock be pledged as collateral thereto, the Chairman of the Board, Cullen F. McDougal, wired each Board member that the stock was being issued and received affirmative replies, said stock was issued and pledged to the bank."

24. The American National Bank held the 110,491 share certificate throughout the year of 1957, and was still holding it on October 13, 1958, when Mr. Diehl filed a sworn affidavit of sole ownership of these shares in the United States District Court,

Eastern District of Texas, Beaumont Division, in reorganization proceedings for Texas Portland.

25. Prior to the March, 1957, issuance of the 110,491 Texas Portland shares Mr. Diehl supplied certain personal financial information to a Mr. James Knott, an accountant hired by Texas Portland in November of 1956. The purpose for supplying this information was to aid Knott in preparing a financial statement for Mr. Diehl to be given to the American National Bank. Both the information supplied by Mr. Diehl and the statement prepared by Knott represented that Mr. Diehl owned the 110,491 Texas Portland shares and further, that the shares were each worth $5.00.

26. On at least two occasions prior to 1957, Mr. Diehl had received stock for services rendered in constructing cement plants.

27. On numerous occasions throughout 1956, 1957 and 1958 prior to the time when the Diehls' joint return was filed, Mr. Diehl solicited tax advice from experts and others concerning the receipt of the 110,491 Texas Portland shares. The record is replete with testimony of advice given prior to the March issuance of these shares. This advice received by Mr. Diehl consistently apprised him that the receipt of the 110,491 shares would constitute ordinary income.

This advice received by Mr. Diehl before the March issuance of the 110,491 shares was based upon the 1955 preincorporation agreement and the resolution passed in the special meeting of January 14, 1957, both of which contemplated issuance of the shares to Mr. Diehl for services rendered to the corporation in his capacity as engineer and president. The actual issuance of the 110,491 shares received by Mr. Diehl and delivered to the American National Bank occurred in a context not dictated or anticipated by either of these earlier agreements.

28. In April of 1958 Mr. Diehl met a certified public accountant named Martin Davis. Davis, presently a college professor, was named as a trustee of Texas Portland in July of 1958. At some time in 1958 prior to the Diehls' July deadline for filing their return, Davis advised Mr. Diehl that the receipt of the 110,491 shares in March of 1957 was taxable as ordinary income. Davis further advised Mr. Diehl that the immediate pledge of these shares to the American National Bank of Beaumont did not in any way alter the taxability of this issuance as ordinary income.

29. In the August of 1960 interview of the Diehls by revenue agents Naiser and McKnight, Mr. Diehl claimed that he never saw or signed the 110,491 share certificate pledged to the bank. The record as well as the deposition testimony of Mr. Diehl reflects that this statement was false. See Government Exhibit 26, p. 121.

30. In this same interview Mr. Diehl stated without naming the solicited sources that he had sought advice concerning the taxability of the 110,491 shares and no one had ever advised him that the receipt of these shares was taxable.

31. The Diehls hired a Mr. Walter Ebanks to prepare their joint return for tax year 1957. To facilitate this preparation, Mr. Diehl supplied somewhat detailed working papers to Ebanks. Government Exhibit 23. At no time either in the working papers or in any other manner did either of the Diehls discuss with or otherwise apprise Ebanks of any of the four fraud items alleged herein.

32. A certified public accountant named Wilbur Swenson, who was aware that Mr. Diehl had pledged his 110,491 Texas Portland shares as collateral for a $200,000 line of credit to Texas Portland, notified Mr. Diehl that the receipt of these shares posed complicated tax problems; he further advised Mr. Diehl to seek out competent legal advice as to the tax consequences of this transaction.

33. On several occasions between December of 1957 and April of 1958, Mr. Albert Marey, a former internal revenue agent who kept the books for Texas Portland during this period, was sought out by Mr. Diehl for advice as to the tax consequences of the 110,491 collateralized Texas Portland shares. The advice given by Marey was that the receipt of those shares constituted ordinary income, since the shares were in Mr. Diehl's name on the

company's ledgers and available to Mr. Diehl as collateral.

34. Some time in 1958 prior to the filing of the joint return on July 21, 1958, page 6 of the June 26, 1957, directors' meeting minutes was altered at the direction of Mr. Diehl. *See* original minutes, Finding of Fact 23, *supra.* Specifically, at the direction of Mr. Diehl, his secretary, a Mrs. Dawson, altered the minutes to read:

"Whereupon Kent B. Diehl, Sr. stated that upon advice of his accountants he would be unable to accept the 110,491 shares of stock issued for his services in engineering, designing, completing financing and supervising construction of the Texas Portland Cement Company plant. Resolution was then made that the Board of Directors issue to Kent B. Diehl, Sr., an option to purchase up to 110,491 shares of stock at five cents per share at any time during the life of the Texas Portland Cement Company . . . [A]ctual purchase of the stock could be effected in whatever amounts desired by Mr. Diehl; however, the total exercise of the option could not exceed 110,491 shares. It was further agreed by the Board of Directors that the stock certificate issued to Mr. Diehl and held by the American National Bank was in error due to the refusal of Mr. Diehl to accept certificate # 6881, and that such stock certificate should be cancelled and reissued to the American National Bank of Beaumont, Texas as Treasury stock from the Texas Portland Cement Company.

"NOW THEREFORE BE IT RESOLVED that the action of the Board in issuing the stock to Mr. Kent B. Diehl, Sr. as evidenced by stock certificate # 6881 for 110,491 shares be nullified due to the refusal of Mr. Diehl to accept same, and that such 110,491 shares of stock be reissued to the American National Bank in Beaumont, Texas as Treasury stock; and that Kent B. Diehl, Sr. be issued a stock option for the purchase of 110,491 shares of stock at 5¢ per share at any time during the life of the Texas Portland Cement Company . . . such option to be exercised in amounts desired by Mr.

Diehl but not exceeding 110,491 shares . . . ."

This alteration in the June 26, 1957, minutes of the Texas Portland directors' meeting reflects a resolution which did not occur on June 26, 1957. The orchestration of this alteration constituted an attempt by Mr. Diehl to alter the tax consequences of the receipt of the 110,491 shares.

### 2. Findings Relating to the Fair Market Value of the 110,491 Texas Portland Shares

35. Texas Portland shares were registered for public issue by the Securities Exchange Commission at five dollars a share in 1956.

36. It was Mr. Diehl's belief that shares of Texas Portland stock were worth about $5.00 each in March of 1957. This belief was manifested by Mr. Diehl on several occasions in the record, including the financial information supplied by Mr. Diehl to one of his accountants, Mr. Knott, who prepared a financial statement of the Diehls for the American National Bank.

37. H. K. Maxey Company, which was licensed by the State Securities Board to sell securities, sold shares of Texas Portland stock in some 350 different transactions between September of 1956 and December of 1957. Government Exhibit 20. The approximate price per share in these transactions was $5.00. The average number of shares sold per transaction was less than 150. Nine of the 350 transactions involved sales of over 650 shares, and two of these nine transactions exceeded 1000 shares.

38. Pursuant to final judgment entered in *State of Texas v. Kent B. Diehl,* Civil No. 111863–B, Dist. Ct. of Travis County, 126th Judicial Dist. of Texas, May 3, 1960, Mr. Diehl's holding of 110,491 shares was reduced to 32,500 shares; 10,000 of this 32,500 were awarded to Calvin Huffman pursuant to a purported preincorporation agreement between Huffman and Diehl. The court based its ruling upon a finding that the 110,491 shares when issued constituted watered stock, since the services rendered by Mr. Diehl were not worth the full 110,-491 shares claimed.

39. The American National Bank of Beaumont, as security for extending a $200,000.00 line of credit to Texas Portland, exacted the following assurances: (a) the pledge of 180,491 shares of Texas Portland, (b) guaranties from Texas Portland, Mr. McDougal and Mr. Diehl in their individual capacities, and (c) an agreement by Mr. S. Perry Brown to purchase the 180,491 shares from the bank whenever called upon to do so.

40. On May 3, 1957, Mr. Diehl purchased 1000 shares of Texas Portland for $1,580.00. In its Notice of Deficiency the government characterized this acquisition as a "compensatory bargain purchase" and assessed an additional $3,420.00 as unreported income for 1957.

41. From a standpoint of cash flow, Texas Portland was in critical condition when the 110,491 shares were issued to Mr. Diehl in March of 1957. Two months later on May 31, 1957, a certified audit of Texas Portland indicated that the company would make money.

### D. Disposition of the 50,005 MVPC Shares

42. The government in this action assesses as fraud items (a) the unreported sale of 25,000 shares of MVPC stock to the A. N. Morgan group for $25,000.00, and (b) the unreported sale of 25,005 shares of MVPC stock to Bankers Life for $40,000.00.

43. Prior to tax year 1957, Mr. Diehl purchased 8,572 shares of capital stock in Vicksburg Properties, Inc., for $2,000.00.

44. Thereafter, Mr. Diehl and others formed the Mississippi Valley Portland Cement Company.

45. On May 15, 1956, stockholders of Vicksburg transferred their assets in exchange for capital stock in MVPC. Mr. Diehl transferred his 8,572 shares of Vicksburg and received a certificate for 42,-860 shares of MVPC. He received a second certificate for 7,145 shares of MVPC in payment for services rendered to Vicksburg. The two certificates representing the 50,005 shares of MVPC capital stock bore the following legend:

"This certificate cannot be transferred before one year from its date or unless public stock subscription has been completed prior to one year from date." MVPC qualified its stock before the Securities and Exchange Commission prior to June 14, 1957.

46. The value that Vicksburg placed on the 7,145 shares received by Mr. Diehl for services rendered was $17,148.00, or $2.40 per share; Mr. Diehl assessed the value of his services at $46,410.00. In its Notice of Deficiency the government assessed the value of these shares at $3.00 per share, or $21,435.00.

47. On February 6, 1957, Mr. Diehl entered into a written loan agreement with a Mr. A. N. Morgan and other officers of MVPC. The A. N. Morgan group advanced $35,000.00 to Mr. Diehl, which he deposited in his bank account. Mr. Diehl executed a promissory note for this $35,000.00, and he secured the loan with the aforementioned 50,005 shares of MVPC capital stock. The contract required that the $35,000.00 plus eight percent interest be repaid by May 7, 1957. The contract also granted the A. N. Morgan group an option to purchase 25,000 of the 50,005 shares for $1.00 per share, provided the option was exercised by May 7, 1957.

48. In the August of 1960 interview with revenue agents Naiser and McKnight, defendant and Mr. Diehl each told the agents that the $35,000.00 received from the A. N. Morgan group was used to operate a company called Plateau Uranium Consolidated, Inc. Defendant was president of Plateau Uranium Consolidated.

49. Mr. Diehl defaulted on the loan, and the A. N. Morgan group failed to exercise their 91-day option.

50. Subsequent to the default on the loan some members of the A. N. Morgan group favored the retention of the entire 50,005 MVPC shares held. On June 14, 1957, while the loan was still unpaid, the A. N. Morgan group agreed to retain 25,000 of the 50,005 shares held as collateral in lieu of payment of the $25,000.00 remaining to be paid on the loan.

51. The second transaction relating to Mr. Diehl's MVPC shares concerned a contract between Mr. Diehl and Bankers Life. Pursuant to this agreement, which was also entered into on June 14, 1957, Mr. Diehl transferred 25,005 shares of MVPC capital stock previously held by A. N. Morgan, for which he received $40,000.00. Of this amount Mr. Diehl deposited $29,027.78 in his bank account. The remaining $10,972.22 was paid to the A. N. Morgan group to cover the $10,000.00 balance on the $35,-000.00 loan, and the 8 percent interest expense in the amount of $972.22. The contract required Mr. Diehl to repurchase 23,-672 of the 25,005 shares transferred within one year for $75,015.00.

52. Mr. Diehl never repurchased the shares.

53. The 25,005 shares of MVPC transferred to Bankers Life was carried on the books of Bankers Life as an asset subsequent to the purchase of these shares by Bankers Life on June 14, 1957.

54. On July 14, 1958, a demand letter was sent to Mr. Diehl for payment of $75,-015.00 in exchange for 23,672 of the 25,005 MVPC shares which Mr. Diehl had previously sold to Bankers Life. The 25,005 shares were ultimately sold by Bankers Life in 1959 to a Mr. Reed for the sum of $60,-012.00.

55. In April of 1957 MVPC stock was registered by the Securities Exchange Commission for sale at $3.00 per share. During 1956 and 1957 MVPC shares ranged in selling price from $2.40 to $4.00 each.

56. In the August of 1960 interview with agents Naiser and McKnight, Mr. Diehl explained that the reason he took so much less than $3.00 per share for his MVPC stock was that actual production had not yet begun, and it was normal in the business for the value of the shares to go down during the organizational phase of a corporation.

## VII. CONCLUSIONS OF LAW

1. Jurisdiction of this action is conferred upon this Court by virtue of 28 U.S.C. § 1340, 28 U.S.C. § 1345, and 26 U.S.C. § 7402(a).

### A. Legal Sufficiency of Evidence Necessary in a Civil Tax Fraud Case

■ 2. Defendant contends that there was no evidence of fraud as to the failure to report $4,500.00 of the $9,000.00 commissions received from Kennedy Van Sauns. She supports this contention with the rule that mere failure to report income is insufficient to establish fraud, *citing Bryan v. Commissioner of Internal Revenue*, 209 F.2d 822 (5th Cir. 1944). Failure to report income, standing alone, would indeed be insufficient evidence to satisfy the "clear and convincing" evidence standard required to prove fraud. *Adame's Estate v. Commissioner of Internal Revenue*, 320 F.2d 811, 812 (5th Cir. 1963). It is nevertheless some evidence of fraud and, depending on the circumstances surrounding taxpayer's omission, it may be properly considered as such. This rule, however, does impose the task on this Court of determining whether the record divulges sufficient additional evidence to support a finding of fraud.

The requisite specific intent necessary to prove the existence of fraud is rarely susceptible of direct proof. *Hicks Co. v. Commissioner of Internal Revenue*, 56 T.C. 982 (1971), *aff'd*, 470 F.2d 87 (1st Cir. 1972). It is invariably proved by circumstantial evidence. In deciding the qualitative and quantitative proof required to establish fraud in a civil tax fraud case, this Court is guided by the recent Fifth Circuit Court of Appeals opinion of *McGee v. Commissioner of Internal Revenue*, 519 F.2d 1121 (5th Cir. 1975). The Court in *McGee* held that the test was essentially the same as that required to prove willfulness in a criminal prosecution. 519 F.2d at 1125. The taxpayer in *McGee* had failed to report illegal kickbacks received during the years of 1958 through 1963. The Commissioner assessed deficiencies and offered evidence that taxpayer's omissions were fraudulent. The Tax Court found that the omissions were fraudulent and expressly set out the evidence upon which it based its finding. The Fifth Circuit affirmed this finding, and noted that "[i]t is the combination of . . . indicia [that] warranted the inference of fraud." 519 F.2d at 1126.

### 1. The $9,000.00 Commissions Received from Kennedy Van Sauns

3. Although the indicia of fraud relating to the $9,000.00 commissions Mr. Diehl received from Kennedy Van Sauns in 1957 cannot be as numerously capsulated as it was by the Tax Court in *McGee*, this Court has concluded that the circumstances surrounding this receipt, and Mr. Diehl's inconsistent explanations therefor satisfy the strict test augured by the Fifth Circuit. *See* Findings of Fact 10–15.

4. As to Mr. Diehl's explanation that the $9,000.00 had been received in two separate checks of $4,500.00 each, false statements made by an accused person to explain or defend his actions may be regarded by the factfinder as tending to establish consciousness of guilt and hence guilt itself. *Wilson v. United States*, 162 U.S. 613, 618, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) (false explanation of incriminating circumstances in murder case); *McGee v. Commissioner of Internal Revenue, supra* at 1126; *cf. United States v. Garza*, 426 F.2d 949, 953 (5th Cir. 1970). *See also* C. McCORMICK, EVIDENCE § 273, at 660 (2d ed. 1972).

5. Defendant's joint income tax return for 1957 was prepared by a Mr. Walter Ebanks some time in June or July of 1958. Mr. Ebanks testified in deposition that Mr. Diehl had given him a rather detailed worksheet to aid in preparing the return. Finding of Fact 31. The worksheet consisted of a meticulous list of deductions, including several items of less than a dollar. It also listed the receipt of $4,500.00 from Kennedy Van Sauns. At the time that this worksheet was given to Mr. Ebanks, Mr. Diehl knew that he had deposited the $9,000.00 check from Kennedy Van Sauns in his bank account. He also knew at that time that he had not paid Mr. Huffman or the Industrial Management Corporation any amount relating to either this $9,000.00 or any other agreement concerning Kennedy Van Sauns. This Court has weighed defendant's expla-nation of carelessness in light of the pains-taking care with which Mr. Diehl prepared his deductions, and has concluded that it is not credible.

### 2. Receipt of the 110,491 Shares of Texas Portland Capital Stock

6. For her contention that the evidence was legally insufficient to establish that the failure to report the receipt of the 110,491 shares of Texas Portland stock was fraudulent, defendant relies primarily on the argument that the shares were not taxable as a matter of law. If she prevailed with this argument, the government's power to avoid the three-year statute of limitations and reaudit her 1957 tax return would hinge entirely on this Court's finding that the omitted $4,500.00 commissions constituted fraud.[2] However, for reasons stated hereinafter, the Court has concluded that the receipt of the 110,491 shares was taxable income and should have been reported as such by the Diehls.

It is difficult to imagine how fraud could have been more compellingly established than was done in this case with regard to the receipt of the 110,491 shares. On two different occasions, both arising subsequent to the issuance and pledge of the 110,491 shares, Mr. Diehl by sworn statement asserted his ownership of these shares. Findings of Fact 20 & 24. It is uncontested that the basis for these claims was a board of directors' resolution awarding the shares in exchange for services rendered. Finding of Fact 17. On at least two occasions prior to 1957 Mr. Diehl had received capital stock in exchange for services rendered, Finding of Fact 26, and he had on numerous occasions been advised by experts as to the tax consequences of such receipts. Finding of Fact 27. After the actual issuance and pledge of the shares to American National Bank Mr. Diehl continued to receive expert advice as to the taxability of the receipt of these 110,491 shares. Findings of Fact 28, 32 & 33. Notwithstanding this advice, Mr. Diehl

2. If the receipt of the 110,491 Texas Portland shares was not taxable as a matter of law, regardless of this Court's finding of fraud, Mr. Diehl could not have intended to do any act recognized as a violation of the revenue laws. *Cf.* G. Hughes, *One Further Footnote on Attempting the Impossible*, 42 N.Y.U.L.Rev. 1105, 1022 (1967).

never once mentioned or otherwise notified his accountant, Mr. Ebanks, who prepared his 1957 return, of the receipt of these shares. Finding of Fact 31. Within a few months of the time that the Diehl's joint return for 1957 was filed, Mr. Diehl, in an effort to alter the tax consequences of the receipt of the 110,491 shares, succeeded in having the minutes of the June 14, 1957, directors' meeting falsified to reflect that the shares were never in fact issued to him, but rather, that he had been awarded an option to purchase the shares at five cents per share. Finding of Fact 34. Finally, in August of 1960, Mr. Diehl lied in an interview with revenue agents Naiser and McKnight in an attempt to conceal his knowledge or state of mind with regard to the receipt of the 110,491 shares. He averred at one point during the interview that he had never seen or signed the certificate issued by the corporation. Finding of Fact 29. He also claimed that no one had ever advised him as to the taxability of the receipt of these shares. Finding of Fact 30.

In summary, the circumstantial proof in this case of Mr. Diehl's bad faith in failing to report the receipt of the 110,491 Texas Portland shares is overwhelming. The expert advice he received both before and after the issuance of these shares, Findings of Fact 26, 27, 28, 32 & 33, and his various efforts to conceal the circumstances of this issuance, Findings of Fact 29, 30, 31 & 34, amply satisfy the rigid burden enunciated by the Fifth Circuit Court of Appeals in *McGee v. Commissioner of Internal Revenue, supra*, whenever the government seeks to prove fraudulent evasion of income taxes.

### B. Receipt of the 110,491 Shares of Texas Portland Capital Stock

#### 1. Taxability of Receipt Under § 61(a)

■ 7. Defendant relies almost exclusively on the authority of *James v. United States*, 366 U.S. 313, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), and Rev.Rul. 68–86 Cum.Bull. 184, for her position that the "conditional" issuance of the shares in question did not result in taxable income under § 61(a). "All income from whatever source derived," § 61(a), has been construed by the

Supreme Court to encompass all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner of Internal Revenue v. Glenshaw Glass Co.*, 348 U.S. 426, 431, 75 S.Ct. 473, 477, 99 L.Ed. 483 (1955). A gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." *Rutkin v. United States*, 343 U.S. 130, 137, 72 S.Ct. 571, 575, 96 L.Ed. 833 (1951). Citing the portion of the Supreme Court's decision in *James, supra*, which quotes with approval these earlier interpretations of taxable income under § 61(a), defendant argues that her husband never had complete dominion over the stock certificate, and hence never derived readily realizable economic value from it. The Court is of the opinion that neither the record nor the legal authorities cited support this contention.

The shares were actually issued on March 19, 1957. The original minutes of the June 26 special meeting of the board of directors reflect that pursuant to a

> "need of funds on March 20, 1957, . . . Mr. Diehl's stock [was] pledged as collateral [for the $200,000 line of credit] and "the Chairman of the Board . . . wired each Board member that the stock was being issued and received affirmative replies, said stock was issued and pledged to the bank."

Mr. Diehl, as a member of that board, president and principal architect of the corporation, corporate intermediary for the loan, and personal transferor of the 110,491 shares, exercised sufficient control to satisfy beyond cavil the "complete dominion" requirement of *James v. United States, supra*, and *Commissioner v. Glenshaw Glass Co., supra*. The corporation needed financing in order to complete preparations for operation. The January 14, 1957, resolution provided for compensating Mr. Diehl with 110,491 shares of capital stock on demand any time 90 days after commencement of operations. When Mr. Diehl committed his shares as collateral for the line of credit to the corporation, he had taken the last step

towards obtaining the fruition of economic gain as owner of these shares. *See Commissioner of Internal Revenue v. First State Bank of Stratford,* 168 F.2d 1004 (5th Cir. 1948), *cert. denied,* 335 U.S. 867, 69 S.Ct. 137, 93 L.Ed. 412 (1948). In choosing to receive his shares in March rather than waiting to receive them pursuant to the January resolution, Mr. Diehl, as president and substantial shareholder of the company, personally orchestrated an accommodation to the company. This accommodation was culminated by pledging the 110,491 shares of stock received by him for services rendered.

8. Mr. Diehl at all times treated the January resolution and the March issuance of the 110,491 shares as satisfaction of his claim to the 110,491 shares of stock. His testimony in the reorganization proceedings, his filing of claims therein as owner of the stock, and his sworn assertions of ownership of the stock to the American National Bank, all support the conclusion that the 110,491 shares received in March of 1957 constituted taxable compensation over which Mr. Diehl exercised complete dominion and control.

9. Citing Rev.Rul. 68–86 Cum.Bull. 184, defendant maintains that the issuance in question here is tantamount to the issuance of restricted stock involved in that ruling. The Court does not agree. The taxpayer employee in Rev.Rul. 68–86 Cum.Bull. 184, elected to receive his salary bonus in stock subject to a restriction printed on the face of the shares which prevented the shares from being sold, assigned, transferred, discounted or pledged as collateral for a loan without the prior written consent of the salary committee of the employer's board of directors. These restrictions applied for the duration of employment and a number of years thereafter, and could not be modified without the approval of the corporation's salary committee. The Internal Revenue Service held that the receipt of shares under these circumstances did not constitute income as long as the restrictions were in effect.

Several controlling differences distinguish the stock restrictions considered in Rev.Rul. 68–86 Cum.Bull. 184, from the 110,491 shares received by Mr. Diehl in the present case.

10. First, the restrictions described in the ruling were printed on the certificate, and any potential buyer was therefore forewarned of the limitations on transferability. In the present case there were no restrictions on the face of the certificate. Indeed, pursuant to an agreement between the American National Banks and a Mr. S. Perry Brown, the shares were transferable to Mr. Brown for $200,000.00 at any time the bank so required. *See* Finding of Fact 10. Moreover, under Texas law to be effective any restriction on transferability must be conspicuously printed somewhere on the certificate. *Ling & Company v. Trinity Savings & Loan Ass'n,* 482 S.W.2d 841 (Tex. 1972). *See also* Tex.Laws 1943, ch. 397, § 15. In *Morgan v. Commissioner of Internal Revenue,* 309 U.S. 78, 80–81, 60 S.Ct. 424, 426, 84 L.Ed. 585 (1940), the Supreme Court held:

> "State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed."

The legal interest created in the present case was a valid and transferable certificate for 110,491 shares of a Texas corporation. Local law in the sense of local statutes and controlling precedents governs the rights of assignability and transfer of interests. *Blair v. Commissioner,* 300 U.S. 5 (1937).

11. Second, and more importantly, defendant's husband in the present case bore a different relationship to his employer than did the taxpayer described in Rev.Rul. 68-86 Cum.Bull. 184. Mr. Diehl was not merely an employee of the corporation, but rather, its president and principal architect. His personal participation and control in influencing both the loan transaction with the American National Bank and the issuance of his stock distinguish the nature of the restrictions he faced from the restrictions involved in Rev.Rul. 68–86 Cum.Bull. 184. Any restrictions on the 110,491 shares in this case were self-imposed.

For these reasons the Court has concluded that the 110,491 shares of Texas Port-

land stock should have been reported as ordinary income by the Diehls in their 1957 joint income tax return.

### 2. Valuation of the 110,491 Texas Portland Shares

#### a. Blockage

12. In an effort to more accurately assess the value of the 110,491 Texas Portland shares issued to Mr. Diehl on March 19, 1957, this Court directed the parties to brief the possible effect that blockage might have had on Mr. Diehl's ability to dispose of these shares. *See Champion v. Commissioner of Internal Revenue*, 303 F.2d 887 (5th Cir. 1962).

On the basis of *Rushton v. Commissioner of Internal Revenue*, 498 F.2d 88 (5th Cir. 1974), *United States v. Rexach*, 482 F.2d 10 (1st Cir. 1973), and *Bryan v. Commissioner of Internal Revenue*, 209 F.2d 822 (5th Cir. 1954), this Court entered a pretrial ruling that the burden of production and persuasion as to the applicability and extent to which blockage affected the fair market value of the 110,491 shares should be borne by the defendant. No evidence was produced at the second trial with regard to the possible effect of blockage. The Court is therefore without any basis for considering whether and to what extent, if any, the size of the block of shares issued to Mr. Diehl affected its fair market value.

#### b.

13. Assessments made by the Internal Revenue Service are presumptively correct. *E. g., Cummings v. Commissioner of Internal Revenue*, 410 F.2d 635 (5th Cir. 1969). In order to overcome this presumption, a taxpayer defending a collection suit must establish that the government's assessment was arbitrary before the burden shifts to the government to establish the amount of deficiency owed. *Bar L Ranch v. Phinney*, 426 F.2d 995 (5th Cir. 1970); *United States v. Lease*, 346 F.2d 696 (2d Cir. 1965). In this case the government's assessment of the taxable income relating to the 110,491 Texas Portland shares issued to Mr. Diehl was based upon a fair market value of $5.00 per share.

14. Fair market value of an asset is measured by what a willing buyer would pay a willing seller when neither is under any compulsion and both are reasonably informed as to all relevant facts. *E. g., Bar L Ranch v. Phinney, supra* at 996, 999; *Willow Terrace Development Co. v. Commissioner of Internal Revenue*, 345 F.2d 933 (5th Cir. 1965), *cert. denied*, 382 U.S. 938, 86 S.Ct. 389, 15 L.Ed.2d 349 (1965).

15. The evidence produced at trial unequivocally demonstrates that the fair market value of the Texas Portland stock during the latter part of 1956 and most of 1957 was as the government contends approximately $5.00 per share. Findings of Fact 8, 35, 36 & 37. In the absence of exceptional circumstances the price at which shares are bought and sold in an open market is by far the best evidence of their value. 10 Mertens, Federal Income Taxation § 59.13 (1976).

16. It is the government's position that the appropriate date for fixing the taxable event resulting from the receipt of the 110,491 shares is either the date of issuance on March 19, 1957, or the date on which Mr. Diehl would have been entitled to the shares pursuant to the January 14 "90 days after operations" resolution of the board of directors, which would have occurred some time in July of 1957. The Court rejects this latter, hypothetical date of receipt or issuance. The Court has concluded in Section VII.B.1. *supra*, that Mr. Diehl's personal control and participation in the early issuance of these shares on March 19, 1957, constituted sufficient dominion and control to result in a taxable event on that date. The Court is therefore of the opinion that it was as of that date that beneficial ownership commenced for the Diehls, and it is as of that date that valuation of the shares should be determined. *See Bankers Trust Co. v. United States*, 518 F.2d 1210, 1216, 207 Ct.Cl. 422 (1975).

17. A basic principle of federal income taxation is that items are taken into income at their "then" current value. *Id.* This principle applies even if the receipt of property is complex in that the current value of the item received may not be self-evident.

*Id.* at 1217. Moreover, this valuation should be determined without regard to subsequent illuminating events. *Grill v. United States*, 303 F.2d 922, 927, 157 Ct.Cl. 804 (1962). This precludes the Court from considering the fact that Mr. Diehl in 1960 ultimately received only 32,500 of these 110,491 shares, pursuant to a state court ruling that the 110,491 shares issued to Mr. Diehl constituted watered stock, Finding of Fact 38.

■ 18. Although the basis for defendant's contention as it related to the question of taxability might well have influenced the value of the 110,491 block of shares issued to Mr. Diehl, this Court is confronted with the uncontroverted fair market value of $5.00 coupled with the presumption of correctness of assessment which is enjoyed by the government. *Bar L Ranch v. Phinney, supra.* The defendant has given this Court no foundation upon which to dispute this assessment. Her position quite simply is that the shares were worth nothing. This Court disagrees; there is no evidence to support the contention that the self-imposed condition to pledge the issued shares was so restrictive as to completely destroy their value to the Diehls. Thus, while the conditional issuance may well have reduced the value of the 110,491 shares, this Court is in no position to hazard a guess as to how to compute the degree, if any, to which this value was diminished.

Defendant has failed to overcome the presumption of correctness of the government's assessment at $5.00 per share, which is amply supported by the evidence.

### C. Defendant's Claim for Offsetting Interest Deductions, Generally

19. The principles that control the tax consequences of both the A. N. Morgan and the Bankers Life transactions are similar; although the facts of these transactions differ somewhat, neither party has argued that these transactions are distinguishable from a standpoint of capital gains. It is not disputed that by virtue of these two business arrangements, Mr. Diehl parlayed 50,005 MVPC shares having a cost basis of $23,435.00 [3] into $64,027.78,[4] which he deposited in his bank account. Evaluating the substance of these two transactions, the Court agrees with the parties to this action that each resulted in capital gains which should have been reported on defendant's 1957 income tax return.

20. Defendant does not dispute that these two transactions resulted in the taxable disposition of appreciated assets which should have been reported on her 1957 joint income tax return. Her position is that she should now be permitted to offset the unreported capital gains with interest deductions to which she was entitled in 1957. This argument finds support in an opinion wherein a taxpayer in a civil suit for fraudulent failure to report income was permitted to avoid tax liability by establishing that understated deductions exceeded the income not reported. *Arctic Ice Cream v. Commissioner of Internal Revenue*, 43 T.C. 68, 73–74 (1964).

Defendant does not argue that there ever existed any oral or written contractual agreement providing for the payments of interest now sought to be deducted. Nor does she argue that it was ever the intention of the parties to designate these hypothetical amounts as interest. She argues simply that interest under § 163(a) is compensation which is paid for the use of money, regardless of whether it is exorbitant or even usurious, citing *Wiggin Terminals, Inc. v. U. S.*, 36 F.2d 893 (1st Cir. 1929); and

---

**3.** The 50,005 shares are represented by a certificate for 7,145 shares, and a certificate for 42,860 shares. Finding of Fact 45. The government valued the 7,145 shares received in payment for services rendered to MVPC at $3.00 each for a total of $21,435.00; defendant does not dispute this figure. The 42,860 Mississippi Portland shares acquired in exchange for 8,572 shares of capital stock of Vicksburg Properties, Inc., had a cost basis of $2,000.00.

**4.** Mr. Diehl received $35,000.00 from the A. N. Morgan group and $40,000.00 from Bankers Life. Findings of Fact 42 & 47. The total consideration exchanged for these amounts consisted of (1) 50,005 shares of MVPC capital stock, and (2) $10,972.22 paid to the A. N. Morgan group.

*Arthur R. Jones Syndicate v. Commissioner of Internal Revenue*, 23 F.2d 833 (7th Cir. 1927). She submits that she should now be permitted to deduct the amount by which the fair market value of the shares transferred exceeded the sums received from the two lenders.

21. In support of this argument defendant urges this Court to apply the "as if" variation of the rule that the substance of a transaction should prevail over its form. She argues that both transactions should be treated "as if" Mr. Diehl had first sold shares at their fair market value and then paid the entire proceeds to the lender. Defendant cites no cases wherein the "as if" theory has prevailed in favor of a taxpayer. Indeed, the only case cited by defendant as authority for this theory was *Henry T. Simonson*, 34 T.C.M. 47 (1975), wherein the court, in ruling against the taxpayer held that the transfer of stock in payment of an obligation constituted a sale.

■ 22. To the extent that neither items of income nor items of deduction need be in the form of cash so long as they can be valued in terms of cash, the application of this "substance over form" rule is appropriate. *See* 2 Mertens § 11.30 at 161 (1976). To this extent treating property "as if" it were the equivalent of cash illuminates the actual substance of a transaction. And to this extent, the Court recognizes the cash equivalent of each of the 50,005 Mississippi Portland shares in the present case as approximately $3.00 per share. Findings of Fact 55 & 56.

■ 23. A deduction, however, is a matter of legislative grace, *P. G. Lake v. Commissioner of Internal Revenue*, 4 T.C. 1 (1944), *aff'd* 148 F.2d 898 (5th Cir. 1945), *cert. denied*, 326 U.S. 732, 66 S.Ct. 41, 90 L.Ed. 436 (1945), and may be taken only when permitted by statute. *Quinn v. Commissioner of Internal Revenue*, 524 F.2d 617, 625 (7th Cir. 1975). In order for defendant to prevail, she must first establish that the deductions for interest which she now asserts come within the purview of § 163.[5] *National Farmers Union Service Corp. v. United States*, 400 F.2d 483 (10th Cir. 1968). Defendant has pointed to no realistic way in which the Court can ignore what actually transpired in this case. *See W. L. Moody Cotton Co. v. Commissioner of Internal Revenue*, 143 F.2d 712, 714 (5th Cir. 1944).

■ This Court is unable to discern how any interest deduction would result for defendant in either transaction, regardless of the fiction employed. For this reason alone defendant's claim for offsetting interest deductions is without merit.

Defendant argues, and it appears from the evidence, Findings of Fact 55 & 56, that the fair market value of the MVPC shares in June of 1957 approximated $3.00 per share. However, since the "as if" computations supplied by defendant would result in increased capital gains based on imaginary sales at the "as if" price, and since the Court here determines that the accompanying "as if" interest deductions sought are without merit, the Court concludes that computations of unreported capital gains should be based upon the amounts of money actually received from A. N. Morgan and Banker's Life in these two transactions. This conclusion comports with the government's computations of deficiency reflected in its Notice of Deficiency. Government Exhibit 18.

### 1. The A. N. Morgan "Secured Loan" Transaction

■ 24. Defendant concedes that the transfer of 25,000 shares of MVPC capital stock to A. N. Morgan on June 14, 1957, in exchange for the release of $25,000.00 of her debt resulted in a sale, and it is well established that a debt secured by stock which is later permitted to be kept by the lender constitutes a sale. *E. g., Peninsula Properties Co. v. Commissioner*, 47 B.T.A. 84 (1942). Urging the previously discussed "as if" theory defendant asks this Court to treat the A. N. Morgan transaction "as if" Mr. Diehl had sold 25,000 of his MVPC

---

5. "(a) General rule.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

shares for $3.00 per share, and had applied the entire $75,000.00 proceeds to the payment of $25,000.00 of his $35,000.00 debt. She argues that the $50,000.00 difference between the value of the stock and the $25,000.00 received should be characterized as interest.

25. However, before the taxpayer is entitled to a deduction for interest expense under § 163(a), she must first demonstrate that there was an obligation on her part to pay the interest contended. *Pounds v. United States*, 372 F.2d 342 (5th Cir. 1967). Defendant has failed to so demonstrate in this case. On June 14, 1957, when Mr. Diehl was in default on his loan from the A. N. Morgan group, the 25,000 MVPC shares held as collateral were not retained pursuant to the option agreement since the option had lapsed. Hence, the Court is not confronted with the question of whether the loan agreement itself created an obligation to pay interest at some later date, since repayment of the loan was consummated pursuant to a subsequent and independent agreement. The record reflects no evidence of any obligation owed to the A. N. Morgan group on Mr. Diehl's part as of June 14, 1957, other than to repay the $35,000.00 borrowed plus eight percent interest. Moreover, the provision in the loan agreement for eight percent interest, coupled with the absence of any express provision for the interest defendant seeks here to deduct, further illustrates that there was in fact no obligation to pay the latter. *See D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776, 805 (1960).

### 2. The Bankers Life Transaction

26. The transfer of 25,005 shares of MVPC shares to Bankers Life on June 14, 1957, unlike the secured loan agreement with the A. N. Morgan group, resulted in a complete divestiture of 25,005 shares to Bankers Life pursuant to the June 14, 1957, repurchase agreement. Findings of Fact 51, 52, 53 & 54. Defendant does not dispute that a sale occurred on that date.

As in the A. N. Morgan transaction, defendant urges the Court to treat the Bankers Life transaction "as if" Mr. Diehl had first sold the 25,005 shares of MVPC stock

at its fair market value of $3.00 per share and then paid the proceeds to the lender in consideration for the $40,000.00 loan. A similarly unrealistic transaction resulted from applying the "as if" notion to the A. N. Morgan loan. However, unlike the contract with A. N. Morgan, defendant can point to the Bankers Life contract and establish that Mr. Diehl's obligation to transfer shares worth $75,015.00 to Bankers Life was an integral part of the agreement. This would seemingly satisfy the "obligation to pay" requirement pronounced in *Pounds v. United States, supra*, 372 F.2d at 352.

27. However, proof of an obligation to pay, without more, is not sufficient to entitle the taxpayer to an interest deduction. *See Kraft Foods Co. v. Commissioner of Internal Revenue*, 232 F.2d 118, 123 (2d Cir. 1956). Although "indebtedness" falls within the broad definition of "obligation," not all "obligations" constitute "indebtedness". *Deputy v. Dupont*, 308 U.S. 488, 497, 60 S.Ct. 363, 84 L.Ed. 416 (1940). The taxpayer must show that what he has characterized as "interest" constitutes an amount payable or owing on an obligation of indebtedness. *Tomlinson v. 1661 Corp.*, 377 F.2d 291 (5th Cir. 1967).

Mr. Diehl incurred a twofold obligation in his agreement with Bankers Life. First, he was obligated to transfer his 25,005 shares to Bankers Life; again, defendant does not dispute that this transfer constituted a sale not reported in her 1957 joint income tax return. And she again characterizes the value of the transferred shares in excess of $40,000.00 as interest. But, this value could not have created a deductible interest expense because it was not an obligation on indebtedness. Rather, it was an obligation arising out of a sales contract to sell 25,005 shares of MVPC capital stock, and it was no different from any other transaction wherein a capital asset is sold for less than its undisputed market value. Defendant is now arguing that she is entitled to an interest deduction measured by the extent of her husband's bad bargain.

Mr. Diehl's second obligation arising out of his contract with Bankers

Life was his promise to repurchase 23,672 of the 25,005 shares of MVPC stock within one year of June 14, 1957. But it is now and was in 1957 clearly settled that an interest deduction was not deductible by a cash basis taxpayer until actual payment of the interest was made.[6] *See, e. g., Bennett Properties Co. v. Commissioner of Internal Revenue*, 45 B.T.A. 696 (1941); *Leadbetter v. Commissioner of Internal Revenue*, 39 B.T.A. 629 (1939). *See also Quinn v. Commissioner of Internal Revenue*, 524 F.2d 617 (7th Cir. 1975). In this case actual payment on the repurchase was never made. But even if Mr. Diehl had repurchased the 23,672 shares pursuant to agreement, and even if the Court ruled that the interest deduction contended here was a permissible one under § 163(a), it nevertheless would not be deductible against income in 1957, unless the repurchase occurred in 1957. *Quinn v. Commissioner of Internal Revenue, supra.*

The Court concludes that neither of the two obligations running from Mr. Diehl to Bankers Life resulted in deductible obligations of indebtedness.

## VIII. CONCLUSION

28. The government succeeded in proving by clear and convincing evidence that Mr. Diehl fraudulently omitted from his 1957 joint income tax return $4,500.00 of $9,000.00 received from Kennedy Van Sauns. The government also proved by clear and convincing evidence that Mr. Diehl fraudulently avoided the tax consequences of the receipt of the 110,491 Texas Portland shares. Although he never knew precisely the extent of his liability as to the issuance of these shares, he knew that he had incurred a substantial tax liability.

Proof by clear and convincing evidence of fraud as to these items of income avoids the three year statute of limitations imposed by § 6501(a), and permits a reaudit of the Diehls' 1957 joint return in its entirety. *Lowy v. Commissioner of Internal Revenue, supra.*

29. Although defendant is not liable for the fifty percent fraud penalty assessed against her under § 6653(b), she did not sustain her burden of proving that she qualifies as an "innocent spouse" under § 6013(e), and is hence liable for all other assessments against her.

30. The disposition by Mr. Diehl of the 50,005 shares of MVPC resulted in unreported capital gains which should have been reported in the Diehls' 1957 joint return in the amount, as adjusted, of $19,894.17, as reflected in the government's Notice of Deficiency. Government Exhibit 18.

31. In the event that any of the foregoing Findings of Fact also constitute Conclusions of Law, they are also adopted as Conclusions of Law. In the event that any of the foregoing Conclusions of Law also constitute Findings of Fact, they are also adopted as Findings of Fact.

Counsel for the government will prepare and submit an appropriate judgment for entry within sixty (60) days, incorporating by reference these Findings of Fact and Conclusions of Law and setting out the monetary consequences as well as making appropriate provision for allocation of costs.[7]

---

6. Although it has not been stipulated, it is clear from the taxpayer's tax return for the year 1957, the balance sheet prepared by Mr. Diehl's accountant as of February, 1957, and the lack of any books or records in evidence which would indicate otherwise, that Mr. Diehl used the cash receipts and disbursements method of accounting.

7. In the interlude between the second trial of this action and this opinion, defendant has filed a Post Trial Brief and a First Motion for Sanctions. The government has responded in opposition to both. Defendant has moved to have this Court dismiss her First Motion for Sanctions.

The Court, having read and considered defendant's Post Trial Brief, has concluded that the material contained therein has no bearing on the resolution of this action. Moreover, the evidence set out therein refers to a document which was not offered into evidence. Accordingly, the government's Motion to Strike Defendant's First Post Trial Brief is granted.

In her First Motion for Sanctions, defendant, *inter alia*, charges the government's attorney in this case, Mr. Barker, and the special agent of the Internal Revenue Service who investigated this case, Mr. Naiser, with deliberately and deceitfully withholding from defendant's counsel, Mr. Pope, Mr. Naiser's report dated March 17, 1961. Having reviewed that portion of the

transcript which demonstrates this allegation to be wholly without any factual basis, the

Court hereby grants defendant's Motion to Dismiss Defendant's First Motion for Sanctions.